IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

YASMIN REYAZUDDIN                    :

                                        :

       v.                              :    Civil Action No. DKC 11-0951

                                          :

MONTGOMERY COUNTY, MARYLAND          :

                                          :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this disability discrimination case are the motion for summary judgment filed by Defendant Montgomery County, Maryland ("the County") (ECF No. 79), and the cross-motion for partial summary judgment filed by Plaintiff Yasmin Reyazuddin (ECF No. 89). Additionally, both parties have filed motions to seal certain exhibits. (ECF Nos. 81 and 91). The issues have been fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendant's motion for summary judgment will be granted and Plaintiff's cross-motion for partial summary judgment will be denied. Defendant's motion to seal will be granted in part and denied in part. Plaintiff's motion to seal will be granted.

## I. Background

### A. Factual Background

Plaintiff has been an employee of Montgomery County since 2002. She is blind. She is fluent in Urdu and Hindi and can conduct Braille translations. Beginning in January 2005, she worked as an Information and Referral Aide ("I&R Aide") in the County's Department of Health and Human Services ("DHHS"). She was hired as a Grade 16. Her duties included answering phone calls from County residents who had questions about obtaining DHHS services, updating residents on their cases, and making needed referrals, including those to MANNA, the County's food bank. As Plaintiff is blind, she needs to use a screen reader to operate a computer. Plaintiff uses a program called Job Access With Speech ("JAWS") which Defendant purchased and installed on her work computer along with providing her with a Braille embosser. JAWS reads aloud speech printed on the computer. Screen readers like JAWS cannot necessarily read everything; the text on the screen must be in a readable code.

Numerous departments within the County's executive branch had call centers similar to the one Plaintiff worked in at DHHS. Beginning in early 2008, the County, in an effort to improve accountability, responsiveness, and efficiency, undertook a project to create a single County-wide non-emergency call

center. This project eventually came to be known as "MC 311."
This case centers around MC 311's technology and staffing.

### 1. MC 311's Technology and Initial Staffing

Mr. Thomas Street of the Office of the County Executive was
the Project Sponsor for MC 311. He submitted an affidavit
stating that the MC 311's technology had to be compatible with
Oracle's Enterprise Resource Planning ("ERP") software the
County had purchased in November 2008. (ECF No. 79-20 ¶ 8).
Four vendors sought the County's business: Lagan, Active Network
Solutions, AINS, and Oracle. (*Id.* ¶ 9). The County ultimately
chose to license Oracle's Seibel software on January 3, 2009
because of its compatibility with the ERP software and
relatively low cost. (*Id.* ¶¶ 10 and 15). It was a "Commercial
Off the Shelf" ("COTS") product which meant it had already been
developed and tested by the manufacturer and provided the
benefit of limited configuration and thus limited cost. Mr.
Street understood from Oracle that Seibel was accessible for
users – *i.e.*, county residents calling into the center – but did
not know at the time that it was not accessible to employees.
The decision to license from Oracle was made without the other
three companies submitting formal proposals. (ECF No. 89-39, at
5, Trans. 14:1 – 15:4, 16:2-11, 19:3-5, Street Dep.).

The Oracle Seibel product licensed by the County was
version 8.1.1. The County hired Opus Group, LLC to implement

and maintain the Seibel system. Mr. John Park of Opus testified that he was not asked to take into account any of the requirements of the Americans with Disabilities Act ("ADA") or the Rehabilitation Act. (ECF No. 89-42, at 10, Trans. 110:21 – 111:10). The product has two modes: High Interactivity ("HI") and Standard Interactivity Plus ("SI+"). HI mode allows for more features, including dynamic editing, auto complete, drag and drop function for attachments, implicit save, client-side validation, graphical flow designer, and message broadcast scroll bar. While HI mode has these additional features, they are not compatible with a screen reader, and thus not accessible to a blind employee. SI+ mode, however, is accessible but lacks these additional features. The County chose to use HI mode for the additional efficiencies it provides, although a representative of Opus testified that a call center could have employees working on both modes simultaneously. (*See* ECF No. 79-34, at 11, Trans. 41:8-15, Park Dep.). In addition to the HI functions listed above, the County chose to utilize three additional features: Computer Telephony Integration ("CTI") toolbar, Smartscript, and Email Response. The CTI toolbar was the heart of the system. It is a mechanism for MC 311 Customer Service Representatives ("CSRs") to accept, transfer, and block calls while allowing management to monitor various metrics such as time spent on a call and time spent away from the system.

Smartscript is a program that would give CSRs a pop-up screen to read to customers. Email Response is a program that allows CSRs to send emails to customers in response to a telephone call. None of these functions were accessible in either HI or SI+ mode when the County selected Seibel. There is no evidence as to the capabilities of any competitor's products.

Ms. Leslie Hamm, head of MC 311, described the work of a CSR. The CSR uses the CTI toolbar to indicate if he or she is available to receive a call. If so, an incoming call will be routed to him or her. The Smartscript program displays a script on the CSR's computer screen that he or she reads from. Within Smartscript is a field for the CSR to begin taking notes or to transfer the call to 911 if he or she realizes that is more appropriate. Once that has been determined, Smartscript is closed and the notes the CSR has taken are populated into the service request template. That template allows for the CSR to do a keyword search (*e.g.*, "pothole") to find relevant knowledge based articles. The CSR will select the most appropriate solution, which will route the issue to the corresponding department (*e.g.*, Department of Transportation for a pothole). The CSR will be given another script to read to the caller providing the case number and any other details, such as expected time to address the problem. Once the call is completed, the CSR uses his or her CTI toolbar to go into a

state dubbed "call work," which is his or her opportunity to finish any paperwork on the just-finished call while preventing the system from sending the CSR another call. Once that work is complete, the CSR is expected to use the CTI toolbar to make him or herself available for another call and the process repeats. (ECF No. 79-28, at 18-19, Trans. 66:8 – 73:8). The CTI toolbar captures metrics upon which CSRs are evaluated. The expected average talk time is three minutes and the after-call work time is ninety seconds. Tier 1 CSRs are expected to handle sixty to seventy calls per day, while those in Tier 2 handle fifty-five to sixty-five calls per day. (ECF No. 79-14 ¶¶ 6 and 8, Hamm Aff.). Ms. Hamm represented that one of the most frequent calls received by MC 311 concerns the current location of County buses. The CSR uses an electronic map called Smart Traveler that has both a visual and textual component. Only the text portion is accessible to a screen reader. Additionally, some of the knowledge based articles direct the CSR to PDF files, some of which also cannot be read by a screen reader. (*Id.* ¶¶ 10, 12).

Plaintiff first heard about MC 311 in May 2008 from her supervisor. She said that she hoped it would be accessible. (ECF No. 89-3, at 6-7, Trans. 61:12 – 62:7, Plaintiff Dep.). When the software for MC 311 was purchased in January 2009, the County had not yet decided whether it would staff MC 311 with

new employees, contract employees, or transfer current employees. (ECF No. 79-20 ¶ 15, Street Aff.). In the middle of 2009, it was determined that staffing would be accomplished by transferring current employees. According to Mr. Street, "[s]ometime thereafter, we learned that a blind employee was being considered for transfer." (*Id.* ¶ 16; *see also* ECF No. 89-12, at 3, Trans. 22:21 – 23:10 (Ms. Hamm first learns of Plaintiff in July 2009)). In August 2009, Ms. Hamm visited Plaintiff at DHHS to observe her work. She communicated her observations to the Opus team in August 2009 and requested that "they investigate the feasibility, time and cost of making the necessary accommodations for Plaintiff to be a fully functional [CSR] at MC 311." (ECF No. 102-5 ¶¶ 9 and 11; ECF No. 102-17). It was expected that Plaintiff, along with the other I&R Aides would transfer to MC 311. Plaintiff went to MC 311 orientation in October 2009; Mr. Ricky Wright, the County's Disability Program Manager, gave her a walk through where she asked about the accommodations. In December 2009, the other I&R Aides transferred to MC 311; Plaintiff did not. During that time, the County was still exploring whether MC 311's technology could be made accessible to a blind employee and, if not, finding Plaintiff alternative employment. She stayed back at DHHS, answering calls for them as she had done before.

On November 18, 2009, the County first contacted Oracle regarding whether MC 311 could be made accessible. Oracle had told the County that a Voluntary Product Accessibility Template ("VPAT") – *i.e.*, a patch - would be ready for version 8.1.1 in the first quarter of 2010. (ECF No. 79-24 ¶ 6, Defendant's Supplemental Answers to Plaintiff's First Interrogatories). Oracle would not meet that deadline. On December 16, 2009, Mr. Wright met with representatives of Oracle. He was told that Seibel was adaptable in one respect, but not in another. A Seibel system could be made accessible so long as it is configured at a basic level, not containing the high interactivity features the County chose to meet its operational needs, specifically the CTI toolbar, SmartScript, and Email Response. In order to achieve accessibility at the higher level, the technology would have to advance from the current "Phase 1" to "Phase 3." That was estimated to occur within the next eighteen months. He was told the cost to adapt Phase 1 – the basic model - would be between $150,000 and $200,000.[1] The cost to adapt to Phase 3 was unknown, as that technology was not yet ready. On January 6, 2010, Mr. Wright determined that

> Given the fact that the adaption of
> technology will not provide the level of
> service needed within the timeframe

---

[1] Mr. Peter Wallack of Oracle testified that it never provided any cost estimates and believed those figures came from Opus. (ECF No. 89-40, at 6, Trans. 20:21 – 21:6).

> necessary to aid the visually impaired
> individuals with performing the full range
> of their jobs; and given the fact that the
> cost to implement the technology for just
> basic services would amount to almost
> $200,000; all while taking into account the
> County's current budgetary concerns, an
> attempt to provide such a reasonable
> accommodation would impose an [u]ndue
> [h]ardship on the County in several areas of
> the undue burden's definition. As a result,
> because there is no reasonable accommodation
> useful to assist in the current job, I will
> be recommending a "reassignment to a vacant
> position" as a form of a reasonable
> accommodation in accordance with Section 8-
> 5(b)(4) of County Personnel Regulations.

(ECF No. 102-19). On January 21, 2010, Ms. JoAnne Calderone,
Plaintiff's I&R supervisor, was told by Mr. Wright that
Plaintiff will be going to MC 311, but it will take about six
months before they are ready for her. (ECF No. 89-20).

On February 4, 2010, DHHS's calls were automatically routed
to MC 311. Plaintiff had no work to do. The next day, Mr.
Wright sent a memo to Ms. Calderone authorizing her temporarily
to reassign Plaintiff to a vacant position within DHHS. It was
termed "temporary" "on the basis of allowing a period of time
for which to sustain employment of [Plaintiff] until the
potential occurrence of her transfer to MC 311 at a future
date." (ECF No. 79-12). The memo went on to state that if a
transfer to MC 311 was not feasible, Plaintiff will still have
priority consideration for any vacant position where she met the
essential job functions and grade. The County's personnel

regulations define "priority consideration" as "[c]onsideration of a candidate for appointment, reassignment, or promotion to a vacant position before others are considered. It does not guarantee that the candidate will be selected for appointment, reassignment, or promotion." (ECF No. 79-13, at 1).

Senior leadership came up with two potential jobs for Plaintiff within DHHS at the same grade level at which Plaintiff was employed at the DHHS call center. One was with the Children's Resource Center; the other with the Aging and Disability Unit ("ADU"). Plaintiff first considered the Children's Resource Center ("CRC") where she was told that the staff was currently overloaded with work and she would be busy for a full eight hour day. She told the head of the Center that she wanted to hold off on committing to it until she heard more about the ADU option. Plaintiff preferred to work for ADU because she wanted to help those with disabilities. She was told that ADU did not have a specific position for Plaintiff, but they would work to put assignments together and create as much meaningful work as possible. She was told there would be some downtime in her work, owing to the fact that they were creating a new position. (ECF No. 79-4, at 23, Trans. 85:2-14; *see also* ECF No. 89-27 (email from John Kenney stating that they have a less than full time job worked out for Plaintiff, but he is concerned a sizable portion is "make work")). Plaintiff

ultimately chose the job with Adult Services Intake ("ASI") within ADU because she understood the CRC job to be temporary. (ECF No. 89-79 ¶ 5).

Plaintiff's job description with ASI estimated her "core duties" to take four to five hours a day, with the principal job being handling MANNA referrals, plus other periodic duties. (ECF No. 89-28). Ms. Aaron, Plaintiff's supervisor, testified that Plaintiff never performed all of her listed duties because, among other reasons, certain offices that she was going to do work for ended up wanting to keep these tasks with them. (ECF No. 89-17, at 8-9, Trans. 80:9 – 90:1).

Plaintiff spoke with Mr. Peter Wallack of Oracle in July 2010 at the convention of the National Federation of the Blind. At that meeting, according to Plaintiff, Mr. Wallack demonstrated an accessible Seibel system. He told her that a patch to fix the Montgomery County issues would be released on July 9. Plaintiff left numerous messages with Mr. Wright with this information, but he did not return her calls. (ECF No. 79-4, at 27-28, Trans. 99:2 – 103:16). The County inquired of Oracle again in July 2010 and was told that a fix should come soon. (ECF No. 102-22). In that same month, Opus presented a Rough Order of Magnitude ("ROM") to the County estimating what it would take to make MC 311 accessible. It estimated the cost at $287,700 and assumed that version 8.1.1.3 or 8.2 would be

installed, although neither version had been released. Furthermore, accessibility was only possible if the employee was operating in SI+ mode. Additionally, it noted that the CTI Toolbar, Smartscript, and Email Response had not been made accessible, in either HI or SI+ mode. Mr. Stephen Heissner, a County IT officer, testified that because version 8.1.1.3 was not available, the County was not in a position to make a decision on whether to proceed. (ECF No. 79-23, at 12, Trans. 45:9-14).

On October 1, 2010, Mr. Wright provided an update on the situation to Plaintiff's supervisors. At that time, Oracle had accessible technology, but "such technology continues to only be at a basic level for which will not allow [Plaintiff] to perform the essential functions of her job at a grade 16 level in the actual MC 311 call center environment." (ECF No. 89-33, at 3). Additionally, the cost of such inadequate technology would be $260,000 initially, with a monthly cost of $78,000 for upkeep and maintenance for the life of Plaintiff's employment. To upgrade only the "back end," non-customer-facing part of Seibel, would cost an estimated $100,000 initially with a recurring monthly cost of $30,000. Mr. Wright concluded that providing a technology system for performance either within MC 311 or at the "back end" as a reasonable accommodation "would create an Undue Hardship, as such an action would be unduly costly." (*Id.* at

4).   Consequently,   he   recommended   reasonably   accommodating Plaintiff   by   reassigning   her   to   a   vacant   long-term   position within HHS or elsewhere with the Executive Branch of the County. Mr. Wright spoke with Plaintiff about these recommendations the same   day.   Plaintiff   told   Mr.   Wright   to   find   her   another position in the County while she continued to work in ASI.   (*Id.* at 28, Trans. 104:17 – 105:13).

On November 15, 2010, the County again inquired about the timeline for a VPAT.   (ECF No. 102-23).   Opus presented a new ROM in April 2011 where it estimated the cost of accessibility at $640,136, which would allow an accessible employee to work only   in   SI+   mode.   This   ROM   still   assumed   the   existence   of version   8.1.1.3   or   8.2   which   had   not   yet   been   released. Additionally, VPATs were needed for CTI Toolbar and SmartScript which still had not yet been published by Oracle.   The increased cost was due to the increased sophistication of MC 311's system as it further integrated into the County's processes.

On   July   1,   2011,   Plaintiff   was   moved   to   the   Aging   and Disability Resource Unit ("ADRU").   She performs the same work as   when   she   was   in   ASI,   still   with   less   than   eight   hours   of work.   Plaintiff continued to have priority consideration and checked   for   HHS   transfer   positions   between   October   2010   and April 2012.   Although there were positions available, Plaintiff was   not   interested   in   any   of   the   jobs.   (ECF No. 79-4, at 35,

Trans. 132:20 – 133:2). In her deposition, Plaintiff stated that the County has provided her "with accommodations, but not all the accommodations to do my job." She agreed that she has been given the necessary accommodations to perform her current position at ADRU. (ECF No. 79-4, at 37-38, Trans. 141:20-22, 142:2-6). Defendant alleges that on August 12, 2011, a representative of the National Federation for the Blind tested accessibility with JAWS in a Seibel test environment. JAWS would not work with the CTI toolbar and therefore she was not able to process calls or service requests. (ECF No. 79-24 ¶ 15).

Oracle finally published the VPATs for the CTI toolbar and Email Response on October 28, 2011. These VPATs were for version 8.2.2. They make these features accessible to screen readers only in SI+ mode, not HI mode. (ECF Nos. 102-7 and 102-8). The VPAT recognizes that even with this patch, the CTI toolbar contains bugs, including the possibility that a transferred call could fail. Mr. Heissner stated this bug could be problematic as sometimes a CSR must transfer an emergency call to 911. (ECF No. 79-31 ¶ 5). Both of these VPATs are for Seibel version 8.2.2. Because the County is still using version 8.1.1, a prerequisite to accommodation would be installing and configuring the upgrade.

Each side presented experts to analyze the cost and other challenges with making MC 311 accessible. Plaintiff's expert is Ms. Temeko Richardson. She testified that she has worked with blind employees in other call centers that are able to use a Seibel CTI toolbar with their JAWS screen reader. One call center in California and one in New York has its blind employees use SI+ mode while their sighted colleagues use HI mode. Another in Chicago has all employees working in SI+ mode. All these call centers were in private entities, however, and not with the government. (ECF No. 89-13, at 3-10, Trans. 6:18 – 13:13). Ms. Richardson testified that to accommodate a blind employee the County would have had to implement some additional solution to the Seibel system because the CTI toolbar was not accessible at the time MC 311 was being built. (ECF No. 89-13, at 19-20, Trans. 89:19 – 90:3). Ms. Richardson's proposed solution to the CTI toolbar issue was to build and install a widget so that blind employees could get the same functionality. Her toolbar would exist outside the Seibel software. (ECF No. 95-2, Report of Ms. Richardson). She estimated the total cost to the County at $129,600 to $193,200. (ECF No. 89-13, at 16-17, Trans. 84:21 – 85:3).

Defendant responded with Mr. Brad Ulrich, an outside IT consultant, and Mr. Stephen Heissner, a Senior IT Specialist for the County's Public Information Office. Mr. Ulrich examined Ms.

Richardson's proposal and the Opus ROMs. He found serious flaws in Ms. Richardson's proposal. First, installing her separate widget would no longer make Seibel a COTS system with all of its advantages. Furthermore, Ms. Richardson's proposal would increase the time spent addressing problems with the software, which would reduce the time MC 311 would be up and running. The biggest flaw he found was that Ms. Richardson assumed that the CSR position was identical to Plaintiff's job with DHHS, when in fact a CSR has a much broader portfolio, encompassing all of the County's departments. That larger breadth means that any tool has to interact successfully with more systems which adds to the complexity, and consequently, the cost. He also believed that Ms. Richardson's cost estimate could not be trusted because her solution was incomplete in that it did not account for the added cost that will come with trying to incorporate a separate widget onto the Seibel system. Mr. Ulrich estimated that Ms. Richardson underestimated the cost of implementation by a factor of four to six and, additionally, her cost estimate did not include the costs of making the system accessible for the back office employees, although he was not sure whether back office employees used the CTI toolbar. Consequently, he estimated that to implement Ms. Richardson's proposals would actually cost somewhere between $648,000 and $1,159,200. His own proposal stayed within the Seibel infrastructure, and assumed the

existence of a bug-free CTI toolbar. His estimated cost was $929,071.[2]

Ms. Richardson filed an affidavit, in which she responded to Mr. Ulrich's largest criticism and stated that her proposal included the initial costs of providing accessibility to each of the thirty-seven County departments that compromise MC 311, not just those previously encompassed in DHHS's portfolio. (ECF No. 105-2). In her supplemental answers to Defendant's interrogatories, Plaintiff acknowledged that Ms. Richardson has not calculated, nor does Plaintiff have any other information about, the projected costs for ongoing operations and maintenance of Ms. Richardson's solutions. (ECF No. 105-3, at 3).

Mr. Heissner stated that the labor required to carry out either of the Opus ROMs or the Ulrich ROM would be substantial and disruptive to MC 311's operations as it would restrict the County's ability to use its internal and contractor resources

---

[2] In addition to the costs of installing a fix, every new addition to the system will have operations and maintenance ("O&M") costs. Mr. Ulrich estimated that his proposal's annual O&M costs would be twenty percent of the implementation costs. He estimated Ms. Richardson's annual O&M costs would be twenty-five percent of her implementation costs. The higher figure is owing to the fact that her proposal is creating a device separate from the Seibel infrastructure. He faulted Ms. Richardson for not including an estimate of O&M costs in her cost figure. He also analyzed Opus's ROMs and found that their analysis was sound at the time it was written. (ECF Nos. 102-9, 102-13, 102-15).

for necessary ongoing operations, bug fixes, upgrades, and enhancements. He went on to state that even if MC 311 was made fully accessible, there is no guarantee that a blind employee using a screen reader could meet the performance objectives such as average talk time and average after call work time. (ECF No. 79-31 ¶¶ 2 and 3).

Finally, Opus updated its ROM on February 19, 2013. It estimated the initial cost of implementation to be $1,146,670 with yearly costs of $229,334. (ECF No. 102-11 ¶ 10, Heissner Supp. Aff.).

### 2. Plaintiff's 2012 Application to a CSR II position

On April 23, 2012, the County posted a job opening for a CSR II position within MC 311. There were two vacancies. The job was classified as Grade 16, Plaintiff's grade. Plaintiff applied for the job. She did not claim a disability or priority consideration in her application.

Forty-five employees initially applied for the position, with two eventually withdrawing. Pursuant to the County's procedures, all applicants were initially reviewed by the Office of Human Resources ("OHR") to determine if they met the minimum qualifications for the job. Plaintiff satisfied those minimum qualifications. The materials of those applicants that met the minimum requirements were forwarded to MC 311 for further review. Between May 2 and May 15, 2012, Ms. Patricia Jenkins

and Ms. Anne Santora from MC 311 reviewed and rated the applicants against the job's five preferred criteria, each on a scale of one to ten, fifty being the highest overall score. Those ratings were then sent back to OHR who divided the group into two lists: "qualified" and "well qualified." There is not an exact science to the cut-off between the two categories; OHR tries to draw the line wherever there is a natural break between the two groups. Only those who are given the "well qualified" designation are placed on the "eligible" list and can be interviewed for the position. Eight applicants were placed on the "eligible" list. All were sighted.

Plaintiff's application traveled on a separate path from the above process. Because she was a current County employee applying for a job at the same grade, she was classified as a "transfer on review" candidate. As such, she had to pass OHR's initial screening for minimal qualifications, but did not have to pass through the review and rating and be placed on the "eligible" list like the other candidates. Once she was deemed minimally qualified, she was deemed eligible to be interviewed, but not put on the "eligible" list. Consequently, there were a total of nine applicants eligible to be interviewed. All but Plaintiff were current MC 311 employees.

Not all eligible applicants have to be interviewed. In determining whether to interview everyone, Mr. Brian Roberts, MC

311's Organization Capacity Specialist and Ms. Hamm's deputy, took it upon himself to do an informal rating of Plaintiff on the fifty point scale used for those who were not transfer on review applicants. (ECF No. 79-33, at 17, Trans. 63:17 – 64:14). On May 24, 2012, Mr. Roberts sent Ms. Hamm an email with his assessment. He gave Plaintiff a rating of thirty-four (34) out of fifty (50). He wrote that Plaintiff has a strong customer service background, but not in a call center. Her weakest attributes are her communication skills and experience with different systems. His score was right below the seventy (70) percent line for the eligible list (ECF No. 89-53), although Ms. Hamm testified that that line was "made up" and not something OHR uses in dividing the groups (ECF No. 79-33, at 17, Trans. 65:10-16). Mr. Roberts concluded his email by stating that ultimately "you [Ms. Hamm] could back up not inviting her to be interviewed. My recommendation is to offer her an interview. . . . Then you can evaluate Yasmin against other candidates, and let the chips fall where they may." Mr. Roberts also opined that in the future, MC 311 can require call center experience for a Grade 16 position. (ECF No. 89-53). Ms. Hamm testified that Mr. Roberts' email did not affect her thinking on the matter because she "already had felt like we should go ahead and interview everyone because we've typically

done that every time." (ECF No. 79-33, at 17, Trans. 64:16-18).
Ultimately, all nine applicants were interviewed.

Interviews are conducted by a panel of three. These interviews were conducted by Ms. Katherine Johnson, Mr. Robert Dejter, and Mr. Dwayne Jenkins, all MC 311 employees. The questions were crafted by Ms. Hamm and Mr. Roberts. Interviewers are instructed to ask the questions and only the questions. No follow-ups; just take notes on what the applicant says. The applicants are allowed a chance to ask questions of the interviewers at the end. Ms. Hamm and Mr. Roberts settled on seven questions.[3] Prior to the interviews, Mr. Wright met with Ms. Hamm, Ms. Johnson, Mr. Dejter, and Mr. Roberts to provide guidance on interviewing a candidate with a disability. Mr. Wright stated that the interview should end with the following two questions: (1) What do you need to be successful in this job?; (2) Do you need any reasonable accommodation?

---

[3] Applicants were asked the following questions: (1) Please describe excellent customer service. Give an example from outside work. Why did you think that service was excellent?; (2) Can you give me an example of your ability to deliver excellent customer service? Why do you think your example is rated "excellent?"; (3) Can you give an example of how your verbal communication skills persuaded someone to take action or solve a problem?; (4) Can you give an example of how your written communication skills persuaded someone to take action or solve a problem?; (5) How do you promote a positive relationship with your peers and supervisors? Why do you think this is important?; (6) Can you give an example of how you were able to effectively handle an irate customer?; and (7) Which Montgomery County information systems or databases have you worked with, and how did you use them? (ECF No. 89-56).

(ECF No. 89-19). Mr. Dejter testified that neither question was asked of any applicant, including Plaintiff. (ECF No. 89-52, at 21-22, Trans. 103:11 – 104:3). In the normal course, applicants are given a sheet of paper with the questions five minutes before the interview. The preview is not required, but it is done as a courtesy to allow the applicant to put his or her thoughts together. (ECF No. 79-33, at 9, Trans. 31:11-21). That was not done in this case because Plaintiff – owing to her disability – would be disadvantaged relative to the other applicants. Mr. Wright said he was going to get the questions translated into Braille, but after many weeks of waiting, Ms. Hamm and Mr. Roberts decided to go ahead with the interviews and not give any applicant the questions in advance. (*Id.*, Trans. 32:9 – 33:20; ECF No. 89-54). Ms. Hamm testified that she did not consider any other method of making the questions available to all applicants in advance, nor did she ask Plaintiff what would be the best way to get the questions to her in advance. (*Id.* at 9-10, Trans. 33:21 – 35:14).

During the interviews, each interviewer takes notes and rates the applicant's response to each question as either "below average," "average," or "above average." Following all the interviews, the three interviewers discuss among themselves and reach a consensus about how to rate each applicant's answers and finally recommend a slate of applicants to hire. The ultimate

hiring decision rests with Ms. Hamm. She is free to deviate from the panel's recommendations.

Plaintiff was the only applicant to ask a question of the interviewers. She asked about the accessibility of MC 311's system and software. Ms. Johnson replied that the County uses Oracle/Siebel and the County would have to look into the matter with the company. (ECF No. 89-50, at 14-15, Trans. 59:5 – 60:1, Johnson Dep.).

The consensus rating for Plaintiff was one above-average rating and six average ratings. (ECF No. 54-1, at 1). She outscored two of the other applicants. The panel recommended the two applicants who scored the highest: one who received five above-average and two average scores, and another who received four above-average scores and three average scores. Ms. Hamm ultimately accepted the panel's recommendation and conditional offers were made to the two highest-scoring applicants. These applicants are not disabled and were already working in MC 311. Plaintiff was designated "consider at a later date." Under this designation, should a vacancy occur within the next six months, Plaintiff would automatically have been considered without having to reapply and go through an interview. An offer to work in MC 311 is conditional on passing a "limited core" medical exam. This exam includes a vision test. Mr. Street testified that a blind individual would not pass the vision test. (ECF

No. 89-8, at 5, Trans. 47:14-18). Because Plaintiff was not given a conditional offer, she did not take the vision test. The limited core exam – and its vision test – were not in place when the decision was made in 2010 not to transfer Plaintiff to MC 311.

### B. Procedural Background

On April 12, 2011, Plaintiff filed a complaint asserting violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, specifically that Defendant's MC 311 computer software is inaccessible to Plaintiff and other blind individuals and that Defendant failed to provide Plaintiff full-time work opportunities appropriate to her skill and experiences. (ECF No. 1). The County answered on September 1, 2011 (ECF No. 10), and filed a motion for judgment on the pleadings on November 15, 2011 (ECF No. 21). On November 29, 2011, Plaintiff moved to amend her complaint to add a claim of violation of Title II of the Americans with Disability Act, 42 U.S.C. § 12132. (ECF No. 26). Both motions were denied by a Memorandum Opinion and Order on January 4, 2012. (ECF Nos. 36 and 37).

On July 24, 2012, Plaintiff moved for leave to file a supplemental complaint (ECF No. 53), which was granted on October 18, 2012 (ECF Nos. 56 and 57). Plaintiff's supplemental complaint added a claim asserting violations of Title II of the ADA, specifically the Defendant's failure to hire her for a call

center position in 2012.  (ECF No. 58).  Defendant answered this complaint on November 1, 2012.  (ECF No. 59).

On April 12, 2013, Defendant filed a motion for summary judgment and a motion to seal.  (ECF Nos. 79 and 81).  Plaintiff filed a cross-motion for partial summary judgment and her own motion to seal on May 13, 2013.  (ECF No. 89 and 91).[4]  Defendant filed its reply on June 12, 2013 (ECF No. 102), and Plaintiff did likewise on July 9, 2013 (ECF No. 105).

## II.  Standard of Review

A court may enter summary judgment only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of

---

[4]  Plaintiff filed an unopposed motion to file a corrected memorandum in support of her cross-motion for partial summary judgment.  (ECF No. 97).  This motion was granted by paperless order.  (ECF No. 98).  Consequently, all references to Plaintiff's memorandum of law will refer to the corrected memorandum, ECF No. 99.

[his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011). The court must deny both motions if it finds there is a genuine dispute of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright, et al., *Federal Practice & Procedure* § 2720 (3d ed. 1998).

## III. Analysis

### A.    Evidence Disputes

Before evaluating the merits of Plaintiff's claims, it is necessary to consider both parties' objections to their opponent's evidence.   Plaintiff argues that numerous affidavits and interrogatory answers submitted by Defendant are sworn to "on knowledge, information and belief," which is insufficient for summary judgment purposes.   Plaintiff asserts that these affidavits fail to demonstrate that they are based on personal knowledge, as opposed to hearsay, or information and belief. Defendant responds by rectifying this alleged error in regard to the affidavits of Ms. Hamm and Mr. Street by filing supplemental versions (*see* ECF Nos. 102-2 and 102-5), but also pointing to the fact that each challenged affidavit contains the statements, "I have personal knowledge of the facts set forth in this Affidavit," and "I am competent to testify to the facts set forth in this Affidavit." (*See, e.g.*, ECF No. 79-5, Ahluwalia Aff.).   Furthermore, each affidavit concludes with the statement: "I do solemnly declare and affirm under penalties of perjury that the foregoing statement are true and correct to the best of my knowledge, information and belief."   Defendant's affidavits substantially comply with the requirements of 28 U.S.C. § 1746 and Plaintiff's objections will be overruled.   *See*

*Hamilton v. Mayor & City Council of Balt.*, 807 F.Supp.2d 331, 353 (D.Md. 2011).[5]

Plaintiff also points to statements in multiple affidavits and answers to interrogatories that contain hearsay. Inadmissible hearsay cannot be considered in support of a party's motion for summary judgment. Fed.R.Civ.P. 56(c)(4); *Whittaker v. Morgan State Univ.*, 524 F.App'x 58, 60 (4th Cir. 2013) (*citing Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("[S]ummary judgment affidavits cannot be conclusory or based upon hearsay.")). Plaintiff is incorrect as to most of the statements she cites. (*See, e.g.*, ECF No. 79-

---

[5] 28 U.S.C. § 1746 provides, in part:

> Wherever . . . any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath or affidavit, in writing of the person making the same . . . such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed to him, as true under penalty of perjury, and dated, in substantially the following form:
>
> . . .
>
> (2) If executed within the United States . . . : "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

37 ¶ 16, Heissner Aff. ("As a general rule in the software industry, operations and maintenance costs for enterprise CRM applications may be estimated at approximately 20% per year of the initial investment for the life of the system.")). To the extent Defendant submits hearsay statements, it also submits those statements from the speaker himself, thereby eliminating any hearsay issues. (*Compare, e.g.*, ECF No. 102-19 (Wright recounts in an email that Oracle told him it would cost $150,000 to $200,000 to make the phase 1 technology accessible) with ECF No. 80-8 (email between Oracle employees recounting the $150,000 - $200,000 estimate by Oracle's implementation team)).

Next, Plaintiff argues that the affidavits of Mr. Venzke and Mr. Delgado should be stricken because they were never identified in discovery as individuals with knowledge relevant to the case. This argument will be rejected as the statements in both affidavits were provided to Plaintiff as part of a discovery dispute last year. (*Compare* ECF No. 79-36 with ECF No. 49-5). Defendant acknowledges that Mr. Venzke was not previously identified, but this error is harmless as Mr. Venzke is merely the successor to Mr. Brian Wilbon, a man of whom Plaintiff was aware. Furthermore, like Mr. Delgado's affidavit, the statements in Mr. Venzke's affidavit are identical to those provided in the same discovery dispute last year. (*Compare* ECF No. 79-27 with ECF No. 49-3).

Plaintiff also argues that the supplemental expert statements of Mr. Ulrich and Mr. Heissner (ECF Nos. 79-31 and 79-46), should be stricken because they are unsworn and Defendant has failed to offer properly any evidence that would qualify them as experts. In addition, Mr. Heissner's supplemental report was not served on Plaintiff until the last day of discovery. Plaintiff's objections will be overruled. To the extent there were any problems with Defendant's original filings, the errors have been corrected by documents attached to its reply brief. (*See* ECF Nos. 102-11 to 14).

Defendant likewise objects to Plaintiff's evidence, characterizing Plaintiff's affidavit as a "sham." Defendant points to the fact that in her deposition, Plaintiff described her daily work as approximately three hours on MANNA referrals, one to two hours on intake calls, one hour on the HHS mailbox, and thirty minutes on the bridge line. (ECF No. 79-4, at 33, Trans. 125:2 – 126:13). In the affidavit she submitted as part of her motion, by contrast, she states that her only regular work is MANNA referrals which could be done in about one hour per day. (ECF No. 89-79 ¶¶ 3 and 4). Defendant characterizes this affidavit as a "sham" that should be disregarded as Plaintiff is contradicting her prior testimony in an attempt to create a genuine dispute of material fact.

"[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). "Application of the sham affidavit rule at the summary judgment stage must be carefully limited to situations involving flat contradictions of material fact." *Elat v. Ngoubene*, --- F.Supp.2d ----, 2014 WL 253411, at *23 (D.Md. Jan. 21, 2014) (*quoting Zimmerman v. Novartis Pharm. Corp.*, 287 F.R.D. 357, 362 (D.Md. 2012)). Defendant's arguments concerning Plaintiff's affidavit will be rejected. While Plaintiff submits in her affidavit that she has less work to do, this is not a flat contradiction of her deposition testimony. Plaintiff testified at her deposition that she spends "not more than three hours" on MANNA referrals (ECF No. 89-3, at 15, Trans. 125:2-4), while in her affidavit she states that MANNA referrals currently "could be done in about one hour per day," (ECF No. 89-79 ¶ 3). These two statements are not flatly contradictory and could also be explained by the fact that the two statements were made approximately one year apart, and over time one's work duties could change. Therefore, it is not appropriate to invoke the

sham affidavit rule and Plaintiff's affidavit will be considered.

## B.  Parties' Motions for Summary Judgment

Plaintiff brings two claims, one for violation of Section 504 of the Rehabilitation Act and one for violation of Title II of the ADA.  Plaintiff claims that Defendant violated the Rehabilitation Act in 2009 by failing to transfer her to MC 311 and failing to accommodate her disability by modifying MC 311's software.  (ECF No. 1 ¶¶ 27-32).[6]  In her supplemental complaint, she alleges that Defendant violated Title II of the ADA by denying her 2012 application to MC 311 because of her disability, and discriminating against her because of her disability by not providing her copies of the interview questions in a format accessible to her.  (ECF No. 58 ¶¶ 42-47).

The standards used to evaluate claims brought under the Rehabilitation Act are the same as those brought under Title I of the ADA.  29 U.S.C. § 794(d) ("The standards used to determine whether this section [of the Rehabilitation Act] has been violated in a complaint alleging employment discrimination

_____

[6]  On November 29, 2011, Plaintiff moved to amend her complaint to add a claim that Defendant's actions in 2009 also violated Title II of the ADA.  (ECF No. 26).  The court denied this motion, finding that Plaintiff had not met Rule 16(b)'s "good cause" requirement to amend after the deadline.  (ECF No. 36). A motion for reconsideration was also denied.  (ECF No. 48).

under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990"); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264 n.9 (4th Cir. 1995) ("Because the language of the two statutes is substantially the same, we apply the same analysis to both."). There are "three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Balt. Cnty., Md.*, 515 F.3d 356, 362 (4th Cir. 2008). Plaintiff brings claims of disparate treatment and failure to accommodate. Plaintiff claims that Defendant has violated Section 504 in 2009 by procuring Seibel software and then configuring it in such a way that it is not accessible to blind employees, thereby making transfer of blind employees to MC 311 impossible. According to Plaintiff, the County has compounded the problem by failing to provide her with full-time work appropriate to her skill and experience. Next, Plaintiff argues that the decision not to transfer her to MC 311 in 2009 was disparate treatment on the basis of her disability.[7]

---

[7] Defendant contends that Plaintiff cannot make a claim under Section 504 because MC 311 has never received federal funding. Section 504 applies to any "program or activity" that receives federal funding. It is undisputed that from its

## 1.    Failure to Accommodate

To succeed on her failure to accommodate claim, Plaintiff must demonstrate that: (1) she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of the disability; (3) she could perform the essential functions of her position with a reasonable accommodation; and (4) the employer refused to provide such accommodations. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (citation omitted). Title I of the ADA provides a definition of the term "reasonable accommodation":

> The term "reasonable accommodation" may include –
>
> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities;
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant

---

conception until July 2010, MC 311 was housed within the County's Office of County Executive ("OCE") and OCE received federal funding. Those circumstances are enough to make the activities of MC 311 – at least through July 2010 – subject to Section 504, even if, as here, none of the federal funding given to OCE was used for MC 311. *Huber v. Howard Cnty., Md.*, 849 F.Supp. 407, 415 (D.Md. 1994) ("While the receipt of federal financial assistance by one department or agency of a county does not render the entire county subject to the provisions of § 504, and while assistance to one department does not subject another department to the requirements of § 504, if one part of a department receives federal financial assistance, the whole department is considered to receive federal assistance so as to be subject to § 504."). Because the activities of MC 311 were subject to Section 504 for at least part of the time in question, it is necessary to proceed to examine the merits of Plaintiff's Rehabilitation Act claims.

position, acquisition or modification of
equipment or devices, appropriate adjustment
or modifications of examinations, training
materials or policies, the provision of
qualified readers or interpreters, and other
similar accommodations for individuals with
disabilities.

42 U.S.C. § 12111(9).

Plaintiff bears the burden of establishing her ability to
perform the essential functions of the CSR position with a
reasonable accommodation. *Tyndall v. Nat'l Educ. Ctrs., Inc. of
Cal.*, 31 F.3d 209, 213 (4th Cir. 1994). The court must decide
"(1) whether she could perform the essential functions of the
job, *i.e.*, functions that bear more than a marginal relationship
to the job at issue, and (2) if not, whether any reasonable
accommodation by the employer would enable [her] to perform
those functions." *Id*. (internal quotation marks and citation
omitted). To determine whether a particular job function is
essential, the court may look to the employer's judgment as to
which functions are essential, written job descriptions prepared
before interviewing applicants for the job, and the work
experience of past employees in the position or similar
positions. 29 C.F.R. § 1630.2(n). The "[p]laintiff bears the
burden of demonstrating that she could perform the essential
functions of her job with reasonable accommodation," *Tyndall*,
31 F.3d at 213, but the defendant "should bear the burden of
proving that a given job function is an essential function,"

35

*Dahlman v. Tenenbaum*, No. DKC 10-2993, 2011 WL 3511062, at *10 (D.Md. Aug. 9, 2011) (*citing Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29, 35 (1st Cir. 2000) (noting that the defendant "has better access to the relevant evidence" to meet this burden; *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1184 (6th Cir. 1996) ("if a disabled individual is challenging a particular job requirement as unessential, the employer will bear the burden of proving that the challenged criterion is necessary.")). The text of the ADA specifically notes that:

> for the purposes of this title, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).

The terms "reasonable accommodation" and "undue hardship" are reconciled as follows:

> a plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an "accommodation" seems reasonable on its face, *i.e.*, ordinarily or in the run of cases. *See, e.g., Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001) (plaintiff meets burden on reasonableness by showing that, "at least on the face of things," the accommodation will be feasible for the employer); *Borkowski v. Valley Central School Dist.*, 63 F.3d 131, 138 (2d Cir. 1995) (plaintiff satisfies "burden of

production" by showing "plausible accommodation"); *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C. Cir. 1993) (interpreting parallel language in Rehabilitation Act, stating that plaintiff need only show he seeks a "*method of accommodation* that is reasonable in the run of cases" (emphasis in original)).

Once the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances. *See Reed,* [244 F.3d] at 258 ("'undue hardship inquiry focuses on the hardships imposed . . . in the context of the particular [employer's] operations'") (*quoting Barth*, [2 F.3d] at 1187); *Borkowski*, [63 F.3d] at 138 (after plaintiff makes initial showing, burden falls on employer to show that particular accommodation "would cause it to suffer an undue hardship"); *Barth*, [3 F.3d] at 1187 ("undue hardship inquiry focuses on the hardships imposed . . . in the context of the particular agency's operations").

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002).

From Plaintiff's perspective, she should have been transferred to the CSR position in MC 311 along with her former DHHS I&R colleagues and the County should have made the modifications necessary to allow her to do so. Thus, she treats the MC 311 CSR position as "her position." The County does not suggest any other perspective, but rather responds with several arguments, including questioning whether Plaintiff's proposed modifications would have enabled her to perform the essential functions of the MC 311 CSR job.

The parties dispute the appropriate focus of the proposed accommodation. Plaintiff argues that the County is incorrect to assert that the requested accommodation in this case is the conversion of MC 311's computer system because the County had an independent, *ex ante*, obligation under Title II and Section 504 to make its computer system accessible whether or not it presently employed any blind persons. As discussed in footnote 6, *supra*, Plaintiff's accommodation claim arises solely under Section 504; she moved to amend her complaint to add a claim for a violation of Title II but was denied. Consequently, her citations to cases arising under Title II are unavailing. (*See* ECF No. 99, at 70-71).

Section 504 states that employment discrimination claims brought under the Rehabilitation Act shall be judged by the same standards as those used for Title I of the ADA. 29 U.S.C. § 794(d); *Myers v. Hose*, 50 F.3d 278, 281 (4th Cir. 1995). Under Title I, a disabled employee must put her employer on notice of her disability. *Schneider v. Giant of Md., LLC*, 389 F.App'x 263, 269-70 (4th Cir. 2010) (*citing E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360, 369 (4th Cir. 2008)); *Rock v. McHugh*, 819 F.Supp.2d 456, 473 (D.Md. 2011). Employers do not have to plan for every possible disability with which they could be confronted. The evidence indicates that MC 311 staffing decisions were uncertain when initial decisions about Seibel's

configuration were being made and Defendant began investigating the feasibility and that, in any event, those decisionmakers were not aware of Plaintiff until July 2009. Thus, the entire scope of the computer conversion would be within the proposed accommodation.

Defendant asserts that Plaintiff is incorrect to equate her old DHHS position with the CSR position in MC 311. MC 311 CSRs must be able to access knowledge-based articles for all thirty-eight agencies and departments within the County. Some of these knowledge-based articles direct the CSR to documents in the PDF format for more information. According to the County, the CSR must be able to read these documents. Additionally, a CSR must be able to read maps as the most frequent question posed to CSRs is the current location of the County's public buses. In terms of performance, the County argues that CSRs are required to answer 55 to 70 calls per day, meet the average call talk time of three minutes or less, and complete their after call work within ninety seconds. (ECF No. 79-2, at 56-58).

In response, Plaintiff contends that the ability to read maps is not relevant to the position as the Smart Traveler system also has a text component that is accessible to a screen reader. In terms of reading PDF documents, Plaintiff argues that some PDFs can be read by screen readers and Defendant has failed to demonstrate why it could not put the unreadable PDFs

into a readable format. Furthermore, these alleged essential functions have been raised for the first time in this litigation and do not appear in the CSR II job description. (*See* ECF No. 89-48). She does not dispute the performance metrics provided by Defendant, but according to Plaintiff, even assuming all of these functions are essential, she has demonstrated that she can perform them with a reasonable accommodation. She points to the words and actions of the County, including the fact that before the accommodation issues became too great, the County was planning to transfer her. (*See* ECF No. 89-6, at 6, Trans. 40:18 – 41:15, Calderone Dep. (Plaintiff's DHHS supervisor said it was her understanding that Plaintiff would be going to MC 311 with her colleagues; ECF No. 89-16, at 2 (same)). Mr. Wright – the official who determined that the accommodation would constitute an undue burden – testified that Plaintiff had the knowledge, skills, and abilities to perform the essential job functions of MC 311. (ECF No. 89-8, at 3, Trans. 32:2-12). Given this state of the evidence, neither side is entitled to summary judgment: both sides have raised a genuine dispute as to whether these are essential functions that she must meet with or without a reasonable accommodation.

Defendant goes on to argue that the technology itself has not advanced to a point where it is capable of allowing a blind employee such as Plaintiff to perform the essential functions.

Defendant points to the fact that Plaintiff's system would have to be put on SI+ mode, which would result in the loss of some features, including dynamic editing, implicit save, drop and drag function, client side validation, message broadcast scroll, and graphic flow designer. But evidence in the record demonstrates that it is possible to have one employee using the system in SI+ mode with the rest in HI mode, (*see* ECF No. 89-42, at 7, Trans. 49:4-17, Park Dep.), and the County has not demonstrated what it is about those six features lost in SI+ mode that are so important as to be considered part of the essential functions of a CSR. If anything, the evidence reflects that the features are useful conveniences, but not critical to the functioning of the MC 311. (ECF No. 89-43, at 4, Trans. 27:21 – 28:18, Heissner Dep. (implicit save will automatically save a record instead of having to hit or click a button)). Finally, Defendant argues that the critical CTI toolbar, even with the long-awaited VPAT from Oracle, has bugs which prevent the County from imparting full confidence in its ability to accommodate a blind employee. Even assuming that is the case, Plaintiff's proposed accommodation is a widget completely to bypass the CTI toolbar and its attendant bugs. While the County has great reservations about the cost and additional maintenance that would come with implementing this system, those are best left for its undue hardship defense. On

the evidence before the court, there is at least a genuine dispute of fact as to whether Plaintiff's proposed accommodation permits her to perform the essential functions of the CSR job.

One affirmative defense to a failure to accommodate claim is that the Plaintiff's proposed accommodation, although reasonable, would cause the employer an "undue hardship." 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9. "The term 'undue hardship' means an action requiring [the employer to undertake a] significant difficulty or expense." 42 U.S.C. § 12111(10)(A); 29 C.F.R. § 1630.2(p). Determination of whether an accommodation would cause an employer an "undue hardship" is informed by consideration of a number of statutory and regulatory factors, including:

> (i) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;
>
> (ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;
>
> (iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;
>
> (iv) The type of operation or operations of the covered entity, including the

composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity;

(v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact of the facility's ability to conduct business.

29 C.F.R. § 1630.2(p)(2); *see also* 42 U.S.C. § 12111(10)(B).

The "undue hardship" question focuses on the impact which the accommodation would have, if implemented, on the specific employer in question "at a particular time." *See* 29 C.F.R. § 1630.15(d). As explained in *Bryant v. Better Business Bureau of Greater Maryland, Inc.*, 923 F.Supp. 720, 737 (D.Md. 1996), this is a multi-faceted, fact-intensive inquiry, requiring consideration of: (1) financial cost; (2) additional administrative burden; (3) complexity of implementation; and (4) any negative impact which the accommodation may have on the operation of the employer's business, including the accommodation's effect on its workforce. 29 C.F.R. § 1630.2(p). "The analysis is essentially one of balancing the benefits and the burdens of the proposed accommodation for a particular employer." *Id*.

Defendant argues that Plaintiff's proposed accommodation constitutes an undue hardship because it is too expensive and disruptive to MC 311. The parties differ in their estimates of

43

how much it would cost to make MC 311 accessible for Plaintiff, with estimates ranging from $1 million from Defendant's expert to $129,000 from Plaintiff's expert. The County argues that even accepting Plaintiff's $129,000 estimate for the purposes of these motions is far too much money given the County's budget for such matters. Defendant represents that in fiscal year 2011, MC 311's operating budget was just more than $4 million, of which 73.6% were taken up by personnel costs. Only $200,000 was approved for upkeep and maintenance of the Oracle software. These figures stayed roughly the same for the next two fiscal years. In addition, the County has a meager budget for reasonable accommodations: the first $500 is paid for by the employee's department. Whatever costs remain can be paid from a $15,000 line-item in the County's overall budget. In addition, the $129,000 figure does not even account for the additional, on-going maintenance of the now-modified system. Plaintiff's expert Ms. Richardson did not provide an estimate for these costs; Defendant's expert estimated the costs at twenty-five (25) percent of the build costs, *i.e.*, $32,500 per year. Beyond the cost issues, the County argues that implementing Plaintiff's proposal would fundamentally alter the way MC 311 does business. It would result in two parallel systems, which would necessitate twice the work – and twice the potential for incompatibility –

every time an upgrade, enhancement, or bug fix was needed. (*See* ECF No. 79-31, at 2, Heissner Supp. Statement).

Plaintiff responds that the Defendant fails to recognize the overall budget of the County: $3.73 billion in fiscal year 2010. Even accounting for the fact that roughly $2 billion of that goes to the County's public schools, the costs of accessibility are miniscule. Plaintiff argues that this broader scope is the correct way to examine the cost issue because to do otherwise would encourage municipal governments to divide up their budgets into ever increasing silos in order to claim that the specific department forced to accommodate does not have the necessary funding. In terms of the alleged increased complexity of Ms. Richardson's proposal, Plaintiff argues that it may be somewhat time consuming, but it is not overly complex.

Defendant has demonstrated that Plaintiff's proposed accommodation – even assuming it permits Plaintiff to perform the essential functions of the CSR position – would constitute an undue hardship. Plaintiff's $129,000 figure is unsupported in as much as it does not take into account increased costs for maintenance and upkeep. Indeed, Plaintiff has acknowledged that Ms. Richardson has not calculated the projected costs for ongoing operations and maintenance for Ms. Richardson's solutions. Plaintiff's estimate is more appropriately deemed an initial cost, with ongoing follow-on costs. While the customer-

facing portion of MC 311 may not be altered by Plaintiff's proposal, the internal portion would be altered and would result in increased maintenance and more downtime, which could spill over into the customer service realm. Accordingly, the County has established the undue hardship defense as a matter of law as it relates to Plaintiff's preferred accommodation.

Moreover, the County provided an alternative reasonable accommodation. The employer need not have "provided the specific accommodation requested . . ., or even . . . provide[d] the best accommodation, so long as the accommodation . . . is reasonable." *Jacob v. Didlake Corp.,* No. DKC-2006-0342, 2007 WL 178256, at *7 (D.Md. Jan. 22, 2007) (*quoting Scott v. Montgomery Cnty. Gov't,* 164 F.Supp.2d 502, 509 (D.Md. 2001)). "In order to be reasonable, the accommodation must be effective (*i.e.,* it must address the job-related difficulties presented by the employee's disability), and it must allow the employee to attain an 'equal' level of achievement, opportunity, and participation that a non-disabled individual in the same position would be able to achieve." *Fleetwood v. Harford Sys. Inc.,* 380 F.Supp.2d 688, 699 (D.Md. 2005).

Reassignment is an acceptable form of accommodation, 42 U.S.C. § 12111(9), but has traditionally been seen as an "accommodation of last resort," that does not arise unless accommodation within the employee's current position would pose

an undue hardship. *See* 29 C.F.R. Pt. 1630, App. at 1630.2(o) ("reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship."); *Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1019 (8th Cir. 2000) (same); *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1301 (D.C. Cir. 1998) (same). An employer is not required to create a new position in order to accommodate an employee. *See Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007); *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 187 (2d Cir. 2006) (collecting similar decisions from the Fifth, Eighth, and Tenth Circuits). An employer is not required to reassign a disabled employee to a position currently occupied, *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 355 (4th Cir. 2001), nor is the employer required to reallocate essential job functions or assign an employee to "permanent light duty," *Carter v. Tisch*, 822 F.2d 465, 467 (4th Cir. 1987). If the employee can be accommodated by reassignment to a vacant position, the employer must offer the employee the vacant position. *E.E.O.C. v. United Airlines, Inc.*, 693 F.3d 760, 761 (7th Cir. 2012); *Duvall v. Georgia-Pacific Consumer Prods., L.P.*, 607 F.3d 1255, 1260 (10th Cir. 2010). EEOC regulations provide that reassignment should first be to "an equivalent position in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a

reasonable amount of time." 29 C.F.R. Pt. 1630, App. at 1630.2(o); *Simmons v. N.Y. City Transit Auth.*, 340 F.App'x 24, 26 (2^d Cir. 2009) ("reassignment does not constitute reasonable accommodation . . . where a position comparable to the employee's former placement is available, but the employee instead is assigned to a position that would involve significant diminution in salary, benefits, seniority or other advantages that she possessed in her former job." (*quoting Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2^d Cir. 1999)); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1177 (10th Cir. 1999) (en banc) (same); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998) (same). "If the employee cannot be reasonably accommodated in her previous position, she must identify another position that is vacant and funded, at or below her level, for which she is qualified to perform the essential functions." *Castellani v. Bucks Cnty. Municipality*, 351 F.App'x 774, 777 (3^d Cir. 2009) (*citing Williams v. Phila. Housing Auth. Police Dep't*, 380 F.3d 751, 770 (3^d Cir. 2004)). Crucially, "if, after an opportunity for discovery, the employee still has not identified a position into which she could have transferred, the court must grant summary judgment in favor of the defendant." *Shapiro v. Twp. of Lakewood*, 292 F.3d 356, 360 (3^d Cir. 2002); *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 750 (7th Cir. 2011) ("plaintiffs, when alleging that an employer's failure to

reassign them violated the ADA's anti-discrimination provisions, bear the burden of showing that there is a vacant position in existence for which they are qualified."); *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 97-98 (2d Cir. 2009) (plaintiff "must demonstrate the existence, at or around the time when accommodation was sought, of an existing vacant position to which she could have been reassigned."); *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1111 (10th Cir. 1999) ("To survive summary judgment, Plaintiff must establish that he was qualified to perform an appropriate vacant job which he must specifically identify and show was available within the company at or about the time he requested reassignment."). The United States Court of Appeals for the Eighth Circuit has held that "[i]f an employer has offered reassignment as a reasonable accommodation, then 'the employee must offer evidence showing both that the position offered was inferior to [her] former job and that a comparable position for which the employee was qualified[] was open.'" *Kallail v. Alliant Energy Corporate Servs., Inc.*, 691 F.3d 925, 933 (8th Cir. 2012) (second and third alterations in original) (*quoting Rehrs v. Iams Co.*, 486 F.3d 353, 359 (8th Cir. 2007)).

While the County's alternative did not involve transfer to MC 311, it still provided Plaintiff with comparable employment. Defendant presented several options for Plaintiff's

consideration.  Plaintiff was initially given the option of two jobs: Children's Resource Center or Adult Services Intake.  The Children's Resource Center was going to be a full-time job, but Plaintiff understood it to be temporary.  The Adult Services Intake position, by contrast, was a more permanent job but the amount of work would fluctuate and often be less than full-time.  Plaintiff was informed of these facts when it came time to choose and ultimately selected the Adult Services Intake position.  As was stated to her, the job was often less than full-time as its primary responsibility – referrals to MANNA – ebbed and flowed depending on a variety of factors outside of Plaintiff's or Defendant's control.  Plaintiff was given, however, priority consideration for any position for which she met the minimum qualifications and which was at or below her current grade.  In other words, she would be considered before all other applicants for any vacancy that she applied for that was classified at a Grade 16 or lower and for which she met the minimum qualifications.  Plaintiff testified that periodically, she would search for positions on the County's transfer database, but never found a job that interested her.  Even accepting Plaintiff's argument as to the inferiority of her new position, she has come forth with no evidence that a job comparable to a CSR was open at the time Defendant presented her with the choice between CRC and ADU.  *See Crabill v. Charlotte*

*Mecklenburg Bd. of Educ.*, 423 F.App'x 314, 324 (4th Cir. 2011) (evidence that employer did not reveal all vacancies that employee could have transferred to). If anything, the evidence illustrates that in the years since Plaintiff chose the ADU position knowing it was less than full-time work, she has seen multiple vacancies with DHHS but chose not to apply for them because they did not interest her. *See Rehrs*, 486 F.3d at 458-59 (employer encouraged employee to apply for positions not requiring shift rotation, but employee declined and instead applied for, and was granted, partial disability leave, but while on leave, employer again encouraged employee to apply for other positions by sending him notices of vacancy, which employee did not act upon); *Scott v. Montgomery Cnty. Gov't*, 164 F.Supp.2d 502, 508-09 (D.Md. 2001) (employer acted in good faith to provide accommodation where it gave employee six months in order fully to determine extent of disability, met with the government's disability program manager in order to find a position to which he could be reassigned consistent with the terms of the collective bargaining agreement, and was ultimately recommended for disability retirement). Consequently, she has failed to carry her burden that she was not reasonably accommodated.

## 2. Disparate Treatment: Failure to Transfer to MC 311

Plaintiff also claims that the failure to transfer her to MC 311 constitutes disparate treatment on the basis of disability in violation of the Rehabilitation Act. To establish a cause of action for disparate treatment under the Rehabilitation Act, a plaintiff must show: (1) that she has a disability; (2) that she is otherwise qualified for the employment or benefit in question; and (3) that she was excluded from the employment or benefit due to discrimination solely on the basis of disability. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).

Neither party disputes that Plaintiff has a disability. Assuming, *arguendo*, Plaintiff is "otherwise qualified," and the failure to transfer her to MC 311 constitutes an "adverse employment action,"[8] Plaintiff may establish the third prong for intentional discrimination using either of two methods. She may either demonstrate through direct or circumstantial evidence that her disability was the sole reason for the employer's

---

[8] The Fourth Circuit has concluded that "employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985). The parties vigorously dispute whether the denial of Plaintiff's transfer to MC 311, and her corresponding diminished responsibilities, constitute an "adverse employment action." It is not necessary to decide this question, because even assuming Plaintiff did suffer an adverse employment action, she has failed to satisfy her burden to demonstrate disparate treatment.

adverse employment decision. Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 520 (4th Cir. 2006) (citation and internal quotation marks omitted). "Only the most blatant remarks, [the intent of which] could be nothing other than to discriminate . . . constitute direct evidence of discrimination." *Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F.Supp.2d 470, 484 (D.Md. 2013) (citation and internal quotation marks omitted). If believed, direct evidence "would prove the existence of a fact . . . without any inference or presumptions." *O'Connor v. Consol. Coin Caterers Corp.,* 56 F.3d 542, 548 (4th Cir. 1995) (citation and internal marks omitted), *rev'd on other grounds,* 517 U.S. 308 (1996). To defeat a motion for summary judgment, the evidence must show that the employer announced, admitted, or "otherwise unmistakably indicated" that an impermissible consideration was a determining factor, or that discrimination can properly be assumed from the circumstances. *Cline v. Roadway Express, Inc.,* 689 F.2d 481, 485 (4th Cir. 1982). Alternatively, Plaintiff may "proceed under a 'pretext' framework" - commonly referred to as the *McDonnell Douglas* approach - "under which the employee, after establishing a *prima facie* case of discrimination, demonstrates that the employer's

proffered permissible reason for taking an adverse employment action is actually pretext for discrimination." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004).

Plaintiff argues that there is direct evidence of Defendant's discriminatory attitude toward Plaintiff and her disability. Plaintiff argues that Defendant spent months planning to make accommodations for her transfer to MC 311 before ultimately deciding against making the necessary investments. She points to the fact that Plaintiff's supervisors told her she would be transferring while MC 311's managers were figuring out whether a transfer was feasible. She draws attention to the fact that on October 1, 2010, Mr. Wright told Plaintiff she would not be transferred because it would be an undue hardship for Defendant to accommodate her disability at MC 311. This evidence, however, does not constitute direct evidence of the County's discriminatory attitude toward Plaintiff. Although in one respect Mr. Wright's comment reflects the fact that her disability was the reason for the denial of transfer, that reason – undue hardship – is properly addressed in a failure to accommodate claim, for which it can be a permissible justification. Additionally, as discussed above, the County's determination that the necessary accommodation was an undue hardship was justified, eliminates the alleged

discriminatory intent Plaintiff wishes to ascribe to the statement.

Absent direct evidence, Plaintiff must prove her case circumstantially using the pretext framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Hooven-Lewis v. Caldera*, 249 F.3d 259, 266-68 (4th Cir. 2001) (applying *McDonnell Douglas* framework to a claim of disability discrimination in employment under the Rehabilitation Act). Under this framework, Plaintiff must first demonstrate a *prima facie* case of disparate treatment. Although the precise formulation of the required *prima facie* showing will vary in "differing factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took an adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Once a plaintiff establishes a *prima facie* disparate treatment case, the burden then shifts to the employer to provide some legitimate, non-discriminatory reason for the disputed action. *Hill*, 354 F.3d at 285. If the employer can do so, the burden shifts back to the employee, who must demonstrate that the reason offered is, in fact, a pretext for discrimination. *Id.* In the end, "[t]he plaintiff always bears the ultimate burden of proving that the

employer intentionally discriminated against her." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). Assuming, *arguendo*, that Plaintiff's non-transfer constituted an adverse employment action and occurred under circumstances giving rise to an inference of unlawful discrimination such that she has established her *prima facie* case, Defendant responds that it only denied the transfer to MC 311 because it determined that the accommodation necessary to make MC 311 accessible to Plaintiff would constitute an undue hardship. Plaintiff responds that that is "transparent pretext for discrimination based on disability." She points to 29 C.F.R. § 32.13(c), which states that "[a] recipient [of federal funding] may not deny any employment or training opportunity to a qualified handicapped employee . . . if the basis for the denial is the need to make *reasonable* accommodation to the physical or mental limitations of the employee." (emphasis added). But the word "reasonable" is key. An accommodation that would constitute an undue hardship for the employer is an accommodation, but it is not a "reasonable accommodation." Otherwise, the whole defense of undue hardship would be rendered meaningless so long as the plaintiff could come forth with some accommodation that would permit her to perform the job's essential functions. Indeed, earlier in the set of regulations "reasonable accommodation" is defined as: "changes and

modifications which can be made in the structure of a job or
employment and training program, or in the manner in which a job
is performed or an employment and training program is conducted,
*unless it would impose an undue hardship* on the operation of the
recipient's program." 32 C.F.R. § 32.3 (emphasis added).
Consequently, the undue hardship exception is built into the
term "reasonable accommodation." Because the necessary changes
to MC 311 to accommodate Plaintiff constitute an undue hardship,
it is by definition not a "reasonable accommodation." Thus,
Defendant is not denying Plaintiff a spot in MC 311 because it
is disinclined to provide reasonable accommodation as proscribed
by 32 C.F.R. § 32.13(c). The cases Plaintiff cites in support
of her position are unpersuasive as they all involve employers
who refused to make accommodations that were held to be
reasonable. *See Carter v. Pathfinder Energy Servs., Inc.*, 662
F.3d 1134, 1149 (10th Cir. 2011) (allegation that employee was
fired because it no longer wished to provide him an
accommodation that it conceded was reasonable raised a genuine
issue of material fact as to whether employee was fired because
of his disability); *Baucom v. Potter*, 225 F.Supp.2d 585, 592-93
(D.Md. 2002) (employee proposed a reasonable accommodation;
instead of granting the reasonable accommodation, employer
terminated employee on account of his disabilities). This
situation is also different from that in *Cathcart v. Flagstar*

*Corp.*, 155 F.3d 558, 1998 WL 390834 (4th Cir. June 29, 1998). First, this is an unpublished decision and therefore not binding on this court. But in any event, in *Cathcart*, a blind employee whom the employer recognized as a stellar worker for seventeen years was denied placement in a position that required use of a computer. The United States Court of Appeals for the Fourth Circuit held that the jury could find that the employee's inability to use a computer because of her vision impairment and, thus, her disability, was the motivating factor behind the decision not to give her the placement. At the time, the hiring official was not aware of the existence of a tool that would allow the blind employee to use the computer. Given that fact, and the fact that the employer was moving toward increased use of and dependence on computers and that this position would involve the use of computers, it was fair for the jury to conclude that Cathcart's inability to use a computer because of her vision impairment was a motivating factor in the decision to deny her the placement. The facts in *Cathcart* are different than what occurred here. In *Cathcart*, the employer impermissibly assumed certain facts about the effects of the employee's disability to do a job, which caused it to deny her a job. That sort of action – making assumptions about the abilities of the disabled – is what the disability laws are designed to combat. In this case, by contrast, the County was

put on notice by the Plaintiff of her disabilities. An investigation was made to see if the MC 311 system could be modified to accommodate Plaintiff's disability. It was determined that the system could not accommodate Plaintiff without incurring an undue hardship, including considerable costs, and for that reason she was not transferred to MC 311. In this respect, Plaintiff's failure to accommodate and disparate treatment claim meld together. Defendant's defense against Plaintiff's failure to accommodate claim is also its legitimate non-discriminatory reason in Plaintiff's disparate treatment claim. In the prior context, the burden of demonstrating an undue hardship fell on Defendant which, for the reasons discussed above, it satisfied even viewing the evidence in the light most favorable to Plaintiff. It necessarily follows that Plaintiff has failed in the disparate treatment context – where the burden is on her to demonstrate a genuine dispute of material fact – to show that Defendant's explanation is pretext. To conclude otherwise would result in an illogical outcome: On the one hand, the law would permit Defendant not to accommodate Plaintiff's disability because it is an undue hardship and, therefore, permit it to transfer her to a vacant position. That permissible decision cannot be the basis for a viable disparate treatment claim. This is not to say that the Plaintiff's litigation strategy is flawed. This is a unique

circumstance: the disparate treatment and failure to accommodate claims are intimately tied together, where the outcome of the former leads to the outcome of the latter. Consequently, summary judgment will be awarded to Defendant on Plaintiff's claim of disparate treatment on the basis of disability in the form of the decision not to transfer Plaintiff to MC 311.[9]

### 3. Disparate Treatment: 2012 Application to the CSR II Position

Plaintiff brings a claim under Title II of the ADA for the County's decision to impose a vision requirement on MC 311 employees and the failure to select her for a transfer in 2012. As an initial matter, Defendant argues that employment discrimination claims such as this are not cognizable under Title II of the ADA, only Title I.

Title I provides:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

---

[9] Alternatively, the fact that Defendant has demonstrated that Plaintiff's proposed accommodation is an undue hardship leads to the conclusion that it would not be a "reasonable accommodation." Thus, it is questionable whether Plaintiff can meet the "otherwise qualified" prong as her proposed accommodation to perform the essential job functions is not reasonable.

42 U.S.C. § 12112(a). Title II, by contrast, provides:

> Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

*Id.* § 12132.[10] Defendant acknowledges there is a difference of opinion among the circuits but argues that the decision by the United States Court of Appeals for the Tenth Circuit in *Elwell v. Oklahoma ex rel. Bd. of Regents of the Univ. of Okla.*, 693 F.3d 1303 (10th Cir. 2012), and the Supreme Court of the United States's subsequent denial of certiorari of that decision, makes it clear that employment discrimination claims are confined to Title I and cannot be brought under Title II.

Defendant misapprehends the force of a decision from a sister circuit and also places far too much meaning upon a denial of certiorari. There is no doubt a circuit split exists as to whether employment discrimination claims can be brought under Title II; the Supreme Court has acknowledged as much while refusing to settle the question. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 360 n.1 (2001). Presently, the Second, Third, Sixth, Seventh, Ninth, and Tenth Circuits

---

[10] One principal difference between Title I and Title II is that non-federal employees must exhaust administratively only Title I claims.

have explicitly held that Title II does not cover disability discrimination in public employment, while the Eleventh Circuit has held otherwise.

While the decisions of other circuit courts make for an interesting debate, ultimately in this district, jurisprudence from two federal courts are most persuasive: the Fourth Circuit and the Supreme Court. As discussed above, the Supreme Court has not ruled on this issue and the fact that it denied certiorari in *Elwell* certainly does not mean it approved its holding, given "the well-settled view that denial of certiorari imparts no implication or inference concerning the Court's view of the merits." *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 365 n.1 (1973). The Fourth Circuit has not explicitly decided the question but it has on two occasions assumed that Title II can be used for employment discrimination claims without expressly analyzing the issue. *See Rogers v. Dep't of Health & Envtl. Control*, 174 F.3d 431 (4th Cir. 1999); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261 (4th Cir. 1995). Consequently, this court assumes, without deciding, that Plaintiff may bring employment discrimination claims against Defendant under Title II. *Lexington Mkt., Inc. v. Desman Assocs.*, 598 F.Supp.2d 707, 713 (D.Md. 2009) ("dictum from the court of appeals should be considered presumptively correct by the district courts within that circuit.") (*quoting Gee v. Lucky*

*Realty Homes, Inc.*, 210 F.Supp.2d 732, 735 (D.Md. 2002)). Plaintiff's claims will be analyzed under the language and precedent of Title I of the ADA. *See* 28 C.F.R. § 35.140 (regulation promulgated under Title II adopts Title I standards for purposes of evaluating employment discrimination claims against public entities).

In her supplemental complaint, Plaintiff alleges that "Defendant discriminated against Plaintiff in the conduct of its job interview by not providing her copies of the questions she was asked in a format accessible to her." (ECF No. 53-3 ¶ 47). Defendant, in its motion for summary judgment, argues that no discriminatory action was taken in regard to the interview questions because no candidates – blind or sighted – received the questions in advance. All candidates were asked the same seven questions. In both her opposition and reply, Plaintiff fails to address Defendant's arguments. Because the burden of proving discrimination rests with Plaintiff, her failure to address Defendant's arguments is fatal to this aspect of her claim that Defendant violated Title II.

Plaintiff alleges that Defendant denied Plaintiff's 2012 application to MC 311 on the basis of her disability in violation of Title II. Plaintiff presents her claim under the *McDonnell Douglas* framework discussed above. She must first establish a *prima facie* case for failure-to-hire based on

disability.   Plaintiff must show that she: (1) is disabled within the meaning of the ADA; (2) applied for the vacant position; (3) was qualified for the position; and (4) was rejected for the position under circumstances giving rise to an inference of unlawful discrimination.   *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005).[11]

Plaintiff satisfies her *prima facie* case.   Neither party disputes that Plaintiff's blindness makes her disabled within the meaning of the ADA or that she applied for the vacant CSR II position in MC 311.   She was qualified for the position as HR found she possessed the minimum qualifications for the job. Finally, the two applicants who were selected for the position were not disabled, raising an inference of unlawful discrimination.

The burden then shifts to the Defendant to produce a legitimate, non-discriminatory reason for failing to select Plaintiff.   Defendant submits that the decision not to hire Plaintiff for the CSR II position had nothing to do with her disability; instead, the two applicants selected were simply

---

[11] As with a claim for employment discrimination under the Rehabilitation Act, a claim under the ADA requires Plaintiff to have suffered an adverse employment action.   The parties dispute whether this denial constitutes an adverse action, and it will be assumed for the purposes of deciding this motion that an adverse employment action occurred.

more qualified for the position.  It points to the evaluation of the two applicants who were selected as compared to Plaintiff.  The two selected applicants received "above average" ratings in five and four of the categories, respectively.  Plaintiff, by contrast, received only one "above average" rating, higher than only two of the nine interviewed applicants.

Plaintiff responds with evidence that she contends demonstrates pretext.  To establish pretext, a plaintiff must present evidence to allow a reasonable juror to find that (1) the legitimate, nondiscriminatory reasons were "unworthy of credence" and (2) unlawful discrimination was the actual motive for the decision.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, at 143, 147 (2000).  Plaintiff may prove that the defendant's proffered reasons were unworthy of credence "by showing that the asserted reasons had no basis in fact, the reasons did not in fact motivate the discharge or, if they were factors in the decision, they were jointly insufficient to motivate the discharge." *Maddox v. Univ. of Tenn.,* 62 F.3d 843, 848 (6th Cir. 1995).  Plaintiff points to numerous pieces of evidence as allegedly illustrative of pretext.  First, if Defendant had met its obligations to accommodate Plaintiff from day one, she would have had call center experience that would have made her a more attractive candidate.  In fact, if Defendant had done its duty and made MC 311 accessible to a

blind employee, Plaintiff would not even find herself in this situation as she would already be working at MC 311 alongside her DHHS I&R colleagues. Plaintiff believes that this failure to obtain call center experience harmed her on the last interview question: County systems or databases used. Not surprisingly, she did not receive an "above-average" score on this question. Second, Plaintiff speculates that Defendant had no intention of ever hiring Plaintiff to MC 311 as evidenced by Mr. Roberts's unsolicited email to Ms. Hamm rating Plaintiff and telling her Ms. Hamm could justify not interviewing Plaintiff. He also suggested that in the future, the County require its applicants to have call center experience, something Plaintiff did not possess. Furthermore, Plaintiff points to the email from Mr. Wright, where he advised the hiring team that "it is most important that an applicant is *not* selected until after Yasmin has also interviewed," (ECF No. 89-54) (emphasis added), suggesting the interview was a sham. Finally, Plaintiff argues that Ms. Hamm was not bound by the interview scores. She could have hired whomever she chose. Plaintiff alleges that Ms. Hamm did not choose her because she knew the County had no intention of implementing an accessible system in MC 311.

Plaintiff's first two arguments can be quickly dispensed with. As discussed above, Defendant acted permissibly not to adopt Plaintiff's proposed accommodation because it was an undue

hardship. Thus the argument that Plaintiff should not even be in the position where she has to apply for an MC 311 job is unavailing. In any event, those circumstances have nothing to do with Ms. Hamm's explanation as to why Plaintiff was not hired. Furthermore, even assuming that with call center experience Plaintiff would have the background to receive an "above average" on the final question, she would have two "above average" marks, still well below the two selected applicants who had four and five "above average" marks. An employer may establish necessary or preferred qualifications and the plaintiff must show that she was objectively more qualified than those chosen. *See E.E.O.C. v. Fed. Reserve Bank of Richmond*, 698 F.2d 633, 671 (4th Cir. 1983), *rev'd in part on other grounds*, *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1983). Plaintiff has not done so. The remainder of Plaintiff's evidence is not sufficient to create a genuine dispute of material fact. Mr. Roberts sent Ms. Hamm an unsolicited email giving Plaintiff a low score and advocating for a future requirement that applicants have call center experience. But Ms. Hamm testified that she paid no attention to Plaintiff's score as she decided to interview all applicants who were deemed "well qualified" or, like Plaintiff, were on the transfer list. The fact that Mr. Roberts desired future MC 311 applicants to have call center experience does not suggest that

Ms. Hamm's explanation that Plaintiff was not one of the two most qualified was a lie. Additionally, there is no evidence the three interviewers who rated applicants ever saw this email. Finally, Mr. Wright emphasized that Plaintiff should be interviewed before making any employment offers. This isolated statement from the County official responsible for ensuring that every applicant should receive equal consideration is not sufficient to conclude that the interviewers' ratings and Ms. Hamm's explanation are unworthy of credence. Stressing equity and advocating for a disabled employee to get a fair shake is Mr. Wright's job. Consequently, Defendant's motion will be granted.[12]

### C. Parties' Motions to Seal

Plaintiff and Defendant each filed motions to seal selected exhibits. Plaintiff seeks to seal Exhibits 49, 53, 55, 56, 57, 59, 60, 61, and 62. (ECF Nos. 90-1 to 90-11). These exhibits are: Ms. Jenkins and Ms. Santora's ratings for all applicants for the CSR II position (ECF No. 90-3, Ex. 49); the interview schedule for the CSR II position, listing each interviewee's

---

[12] Because Plaintiff was not given a conditional offer of employment, she was not given the medical exam, which includes a vision test. The ADA prohibits an employer from requiring an employee to undergo a medical examination "unless such examination . . . is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Because Plaintiff did not progress to the point where the vision test became an issue, it is not necessary to evaluate the propriety of that requirement.

name (ECF No. 90-4, Ex. 53); the interview notes and evaluations for every interviewee (ECF Nos. 90-5 to 90-7, Ex. 55 to 57); the offer letters to the two applicants selected for the CSR II position (ECF Nos. 90-8 and 90-9, Ex. 59 and 60); and the resumes of the two applicants selected for the CSR II position (ECF Nos. 90-10 and 90-11, Ex. 61 and 62). These documents were designated "confidential" pursuant to a January 11, 2012 Protective Order. (ECF No. 20-1). Defendant has not opposed Plaintiff's motion.

Defendant seeks to file under seal Exhibits 5, 6, 22, 31, 33, and 37. These exhibits are: the 2010 and 2011 ROMs by Opus (ECF No. 80-1 and 80-2, Ex. 5 and 6); the interview notes and evaluations for Plaintiff and the two applicants selected for the CSR II position (ECF No. 80-3 to 80-5, Ex. 22); Plaintiff's application to the CSR II position (ECF No. 80-7, Ex. 33); email correspondence between Opus, Montgomery County, and Oracle between June and November 2010 regarding the accessibility of Seibel (ECF No. 80-6, Ex. 31); and email correspondence between Oracle and Montgomery County in December 2009 concerning the options given the accessibility issues (ECF No. 80-8, Ex. 37). These documents were also marked confidential pursuant to the Protective Order. Plaintiff opposes sealing some of these exhibits. She opposes sealing the two ROMs because whatever confidential information is contained in them is out of date

and, in any event, Defendant quotes from each of them extensively in its motion for summary judgment. She objects to sealing the part of Exhibit 31 that consists of emails between Montgomery County employees that were not even marked "confidential." (ECF No. 80-6, at 8-12). She does not object to sealing correspondence between Oracle and Defendant. (*Id.* at 1-8). Finally, Plaintiff waives any privacy rights in her own job application, thus it should be unsealed. (ECF No. 94).

"The right of public access to documents or materials filed in a district court derives from two independent sources: the common law and the First Amendment." *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004). "The common law presumes a right of the public to inspect and copy 'all judicial records and documents,'" *id.* at 575 (*quoting Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988)), although this presumption "'can be rebutted if countervailing interests heavily outweigh the public interests in access.'" *Id.* (*quoting Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988); *see also Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597–99 (1978). Under this common law balancing analysis, "[t]he party seeking to overcome the presumption bears the burden of showing some significant interest that outweighs the presumption." *Rushford*, 846 F.2d at 253. "Ultimately, under the common law[,] the decision whether

70

to grant or restrict access to judicial records or documents is a matter of a district court's 'supervisory power,' and it is one 'best left to the sound discretion of the [district] court.'" *Va. Dep't of State Police*, 386 F.3d at 575 (*quoting Nixon*, 435 U.S. at 598–99) (second alteration in original).

In addition to the public's common law right of access, the First Amendment provides a "more rigorous" right of access for certain "judicial records and documents." *Va. Dep't of State Police*, 386 F.3d at 575-76; *see also In re Application of the United States for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 290 (4th Cir. 2013) (explaining the "significant" distinction between the two rights of access). Where the First Amendment does apply, access may be denied "only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Stone*, 855 F.2d at 180.

"For a right of access to a document to exist under either the First Amendment or the common law, the document must be a 'judicial record'" in the first instance. *In re Application*, 707 F.3d at 290. The Fourth Circuit recently held that judicially authored or created documents are "judicial records," as are documents filed with the court that "play a role in the adjudicative process, or adjudicate substantive rights." *Id.* (*citing Rushford*, 846 F.2d at 252; *In re Policy Mgt. Sys. Corp.*,

67 F.3d 296 (4th Cir. 1995) (unpublished table decision)). "[T]he more rigorous First Amendment standard should . . . apply to documents filed in connection with a summary judgment motion in a civil case." *Va. Dep't of State Police*, 386 F.3d at 578 (*quoting Rushford*, 846 F.3d at 253) (alteration in original).

Thus, as a substantive matter, when a district court is presented with a request to seal certain documents, it must determine two things: (1) whether the documents in question are judicial records to which the common law presumption of access applies; and (2) whether the documents are also protected by the more rigorous First Amendment right of access. *In re Application*, 707 F.3d at 290; *see also Va. Dep't of State Police*, 386 F.3d at 576.

The sealing of any judicial records must also comport with certain procedural requirements. First, the non-moving party must be provided with notice of the request to seal and an opportunity to object. *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984). This requirement may be satisfied by either notifying the persons present in the courtroom or by docketing the motion "reasonably in advance of deciding the issue." *Id.* at 234. In addition, "less drastic alternatives to sealing" must be considered. *Va. Dep't of State Police*, 386 F.3d at 576; *see also* Local Rule 105.11 (requiring any motion to seal to include both "proposed reasons supported by specific factual

representations to justify the sealing" and "an explanation why alternatives to sealing would not provide sufficient protection"). Finally, if sealing is ordered, such an order must "state the reasons (and specific supporting findings)" for sealing and must explain why sealing is preferable over its alternatives. *Va. Dep't of State Police*, 386 F.3d at 576.

Plaintiff's motion to seal will be granted. The proposed sealed documents are personnel records including the CSR II applicants' ratings, resumes, and offers of employment. These documents, concerning those who are not parties to this litigation, will be sealed. *See Brown v. Siemens Healthcare Diagnostics, Inc.*, No. DKC 11-0769, 2012 WL 3136457, at *12 (D.Md. July 31, 2012) (granting a motion to seal the personnel records of employees who are not parties to this litigation). In addition, the court did not rely on the substance of these documents in reaching its decision to grant Defendant's motion for summary judgment and denying Plaintiff's cross-motion.

Defendant's motion to seal will be granted in part and denied in part. Its request to seal the personnel information of non-parties will be granted. Its request to seal Plaintiff's CSR II application will be denied as Plaintiff has waived her privacy right to that document. Its request that the two ROMs be sealed will be denied. Defendant quotes extensively from the ROMs in its motion for summary judgment. Furthermore, Defendant

included in its entirety the deposition of Mr. Park of Opus, where he goes through each ROM slide in detail. (ECF No. 79-34). Defendant filed neither of these documents in a sealed or redacted form. *See Butler v. DirectSAT USA, LLC*, 876 F.Supp.2d 560, 577 (D.Md. 2012) (denying a motion to seal documents that were discussed extensively in an unsealed memorandum). Finally, Defendant's request to seal its correspondence with Oracle will be denied. Defendant has not provided any justification as to why these documents need to be sealed besides arguing that they generally contain technical, confidential, and proprietary information that has been exchanged pursuant to the Confidentiality Order. That sort of blanket argument will not suffice on a motion to seal, especially where Defendant failed to explain how an alternative to sealing, such as submitting redacted copies, was not feasible. In addition, much of the information discussed concerns accessibility issues and if fixes have been published or when those fixes are expected. Defendant relied on this timeline in making its argument that accessibility for MC 311 was not feasible.

**IV. Conclusion**

For the foregoing reasons, Montgomery County's motion for summary judgment will be granted and Ms. Reyazuddin's cross-motion for partial summary judgment will be denied. Defendant's motion to seal will be granted in part and denied in part. Plaintiff's motion to seal will be granted. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge