IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

YASMIN REYAZUDDIN            :

                             :

    v.                     :    Civil Action No. DKC 11-0951

                             :

MONTGOMERY COUNTY, MARYLAND    :

                             :

**MEMORANDUM OPINION**

After more than six years of litigation in this employment discrimination case, the remaining issues of declaratory and injunctive relief are ready for resolution.

## I.    Background

In April 2011, Plaintiff Yasmin Reyazuddin ("Plaintiff"), a Montgomery County employee since 2002, brought the instant suit in which she has brought claims under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* (ECF No. 1). In early 2008, Defendant Montgomery County, Maryland ("Defendant" or "the County") began a reorganization of the County's customer service employees from various executive departments to a single county-wide call center, referred to as "MC 311." At that time, Plaintiff worked as an Information and Referral Specialist in the County's Health and Human Services Department ("HHS"). Although her colleagues in the same or

similar positions were transferred to MC 311 as Customer Service Representatives ("CSRs") when the call center finally opened in the fall of 2009, Plaintiff, who is blind, was not transferred to the call center because the County thought it would be too burdensome to make the tools and software used by CSRs accessible to her. Instead, Plaintiff was transferred to two positions within the Aging and Disabilities Services ("ADS") section of HHS. Her discrimination claims faulted the County for failing to provide a reasonable accommodation for her disability that would allow her to transfer to MC 311 as a CSR with her non-disabled peers.

During a February 2016 jury trial, Plaintiff presented evidence that her ADS positions failed to provide her with consistent, meaningful work and that she could have performed the job duties of a CSR with a reasonable accommodation. The court instructed the jury to consider, *inter alia*, whether Plaintiff could perform "[t]he essential job functions . . . routinely performed by individuals in the MC 311 call center." (ECF No. 212, at 11). The jury found that Plaintiff could perform the essential functions of a CSR with a reasonable accommodation and that Defendant had failed to provide a reasonable accommodation for her disability. (ECF No. 221). The jury also reviewed and rejected Defendant's affirmative defense that it would have been an undue hardship "to implement

the software accommodations Plaintiff had requested." (*Id.*; ECF No. 212, at 13-14). It determined, however, that Plaintiff had sustained zero dollars in damages. (ECF No. 221).

Plaintiff's complaint also sought injunctive and declaratory relief. (ECF Nos. 1, at 8-9; 58, at 10). After the jury trial, Plaintiff moved for an order requiring Defendant to make MC 311 accessible and to give Plaintiff a job as a CSR, consistent with the position she would have been in had the discrimination not occurred. (ECF No. 228, at 7). Defendant argued, first, that injunctive relief was inappropriate and, second, that Plaintiff's entitlement to a reasonable accommodation had been satisfied when the County offered Plaintiff a position at the Columbia Lighthouse for the Blind ("CLB") in October 2015. (ECF No. 229). This offer, which Plaintiff rejected, was made during the litigation. Rather than incorporate that offer into the then-upcoming jury trial, Plaintiff limited her claims at that trial to the County's conduct and her damages up until the October 2015 offer of a position at CLB. (*See id.* at 7-8). Whether the CLB position was a reasonable accommodation was therefore not considered by the jury. Thus, notwithstanding the jury's verdict that the ADS positions were not a reasonable accommodation, Plaintiff's initial motion for injunctive relief was denied because she had not demonstrated that the CLB offer had not extinguished any

entitlement she might have had to injunctive relief. (ECF Nos.
235, at 1; 246, at 61-63). The parties proceeded to discovery
to litigate Plaintiff's equitable claims in May 2016. (ECF Nos.
236; 238; 241).

While discovery related to the CLB offer was ongoing,
Defendant notified Plaintiff that she would be transferred to MC
311. (ECF No. 258-1, at 1). This transfer occurred on October
26, 2016, and Plaintiff is now employed as a CSR II at MC 311.
Defendant then moved to stay discovery to brief whether
Plaintiff's claims had been mooted by her transfer. (ECF No.
258). The court granted the stay temporarily and ultimately
determined that an evidentiary hearing was necessary to resolve
Plaintiff's request for injunctive relief in light of her new
position. (ECF Nos. 262; 266). In advance of that hearing,
Plaintiff filed a new motion for injunctive relief and a motion
for partial summary judgment as to the CLB job offer. (ECF Nos.
295; 296). Defendant filed a motion to dismiss or for summary
judgment. (ECF No. 300). Each of these motions was briefed in
full by the parties, and the court deferred consideration of the
motions. (ECF Nos. 304; 310; 311; 315; 316; 319; 322).

In light of Plaintiff's current placement, she has modified
her request for injunctive relief. Although she is working at
MC 311, Plaintiff argues that Defendant continues to
discriminate against her. Specifically, Plaintiff contends that

differences between her job duties as a CSR and the duties of other CSRs constitute an ongoing failure to provide a reasonable accommodation. Plaintiff currently seeks: (1) a declaration that Defendant discriminated against her because of her blindness and (2) a permanent injunction ordering the County to make certain technology systems accessible to her and prohibiting it from allowing the accessibility of currently accessible systems to lapse. (*See* ECF Nos. 295; 351). The issues were briefed in dispositive motions on injunctive relief and mootness, and an evidentiary hearing was held from April 19 to April 28, 2017. (*See* ECF Nos. 295; 300; 310; 311; 316; 319; 328; 329; 330; 331; 332; 346; 348). Upon consideration of the evidence adduced at the jury trial and the evidentiary hearing, as well as the parties' arguments with respect thereto, the court now issues findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## II. Mootness

Defendant contends that the Plaintiff's claim is now moot because she has been placed at MC 311 as a CSR as she originally requested. The mootness doctrine applies "when the issues

---

[1] Rule 52(a) provides, in relevant part, that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court."

presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011) (citing *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008)). Mootness deprives a court of jurisdiction over a case. "If intervening factual or legal events effectively dispel the case or controversy during the pendency of the suit, the federal courts are powerless to decide the questions presented." *Ross v. Reed*, 719 F.2d 689, 693-94 (4th Cir. 1983).

In its motion papers, the County argues that there is no "ongoing case or controversy [] involving her requested injunctive relief – to be instated as a CSR II at MC 311." (ECF No. 300-2, at 24). The County claims that it has remedied the injury that Plaintiff had previously suffered. (*Id.* at 26-27). It contends that the County provided the relief Plaintiff sought when it "voluntarily transferred Plaintiff to MC 311 and [] invested hundreds of hours of employee and contractor time to facilitate Plaintiff's transition into working as a CSR II at MC 311." (*Id.* at 26).

It is undisputed that Plaintiff is working at MC 311 and her job title is CSR II, but these facts alone are insufficient to moot Plaintiff's claims for injunctive relief without review of the merits. Defendant's argument relies on the factual and legal determinations presently before the court, specifically,

whether her current role provides her with a meaningful equal employment opportunity as required by the ADA. Here, if Plaintiff could prove her claim that, in spite of her change in location and job title, Defendant's refusal to make certain technological tools fully accessible to her constituted a failure to provide her with a reasonable accommodation, she would have a "live" claim for injunctive relief. Only if Defendant is correct that it is now complying with its legal requirements under the ADA would the controversy cease to exist. Mootness occurs when the resolution of the issues presented in the case would not effectuate a remedy, even if the claims were resolved in the plaintiff's favor. Because Defendant's mootness argument hinges on the merits of whether Plaintiff's current placement satisfies the requirements of the ADA, the case clearly is not moot.

### III. Facts from Evidence Presented at the Jury Trial and the Evidentiary Hearing[2]

---

[2] These findings are based on the evidence presented at the jury trial and the evidentiary hearing. At the latter, the parties presented limited live testimony and submitted deposition testimony from numerous witnesses. Most evidentiary objections were raised during the hearing and resolved. A few objections were noted for later resolution and remained at the conclusion of the hearing. None of those remaining objections pertain to evidence that is germane to the rulings announced in this opinion, and, accordingly, to the extent any pending objections remain, they are denied as moot.

At the evidentiary hearing, Plaintiff presented fact testimony from Dieter Klinger, Katherine Johnson, Chris Daniel, Stephen Heissner, and Jay Kenney. These witnesses and others at the evidentiary hearing testified primarily as to the workings of MC 311 and differences between Plaintiff's CSR II role and that of other CSR IIs. Defendant presented fact testimony from Plaintiff, Mr. Klinger, Mr. Daniel, Mr. Heissner, Mr. Kenney, Chris Turner, Robert Sinkler, William Potter, Kim Alfonso, Vivian Green, and Leslie Hamm. Most of Defendant's fact witnesses are either employees of MC 311 who supervised or trained Plaintiff or other County employees, primarily in the Department of Technology Services ("DTS"), who helped provide technology accommodations for Plaintiff. They testified as to the variety of ways that Defendant has already accommodated Plaintiff in her new position. The parties' experts testified as to whether it was possible and at what costs, in terms of time and money, to make certain systems accessible to Plaintiff.

### a. The MC 311 Call Center

MC 311 uses a software system produced by Oracle Corporation called Seibel to track and respond to incoming calls. The County currently uses version 8.2.2.4 of Siebel, a newer version than the one considered in the jury trial. Version 8.2.2.4 is not the newest version of Seibel, however. At least two updated versions, referred to as Innovation Pack 15

and Innovation Pack 16 ("IP 16"), exist and would increase the accessibility of the system to blind users.  The County has a contract in place to upgrade to IP 16 and expects to implement it by the end of 2017.

Seibel has two interfaces: a public portal, through which County residents can submit requests online, and an internal portal, through which CSRs submit service requests on behalf of the people who call MC 311.  The internal portal is more comprehensive than the public portal.  While using the internal portal, for example, CSRs read through Knowledge-Based Articles ("KBAs"), pre-written instructions, based on a caller's request type, for how appropriately to answer the caller's question and submit the service request.  The internal portal is also integrated with the County's phone system, which provides CSRs with a series of tools, referred to as the CTI Toolbar, that help manage calls, transfer caller information, and monitor CSR status.  After a request is submitted, it goes to the appropriate County department to be resolved.  Seibel assigns each service request a reference number that can be tracked by the resident or other CSRs to check progress on the request.

The call center divides calls into two "Tiers" based on the types of knowledge and software necessary to respond to them. Tier 1 calls are calls related to any department that can be answered easily by most CSRs.  These calls include many of the

most common requests and are generally resolved using only the Seibel system, KBAs, and a series of interactive maps. Certain other calls require the CSR to use supplementary software and databases related to several departments including HHS (CARES), the Permitting Services Department (Hansen), the Finance Department (Munis), as well as Human Resources for County employees. Some of those systems are created and maintained by other entities, separate from Montgomery County. In addition to creating service requests in Seibel, CSRs answering these calls must provide specialized information as to the types of services available and must know how to use these department-specific databases. MC 311 refers to these more complicated calls as Tier 2 calls. All calls enter the system as Tier 1 calls because the call center does not know why a resident is calling before answering the call; calls are then reassigned as Tier 2 if necessary.

MC 311 employs two corresponding types of CSRs. A CSR I can assist with Tier 1 requests but not Tier 2 requests. They answer all calls as they come in and directly respond to any Tier 1 inquiries. If answering a caller's question requires the specialized training and database access for one of the Tier 2 departments, the CSR I will place the call into the Tier 2 queue specific to the appropriate Tier 2 department. The caller will

then be transferred to a line that will be answered by someone trained to assist with that type of Tier 2 call.

Those CSRs who can answer Tier 2 calls are called CSR IIs. Most CSR IIs are trained in more than one, but not usually all four, of the departments. Thus, a single CSR II might answer calls from, for example, both the HHS and Permitting Departments. CSR IIs generally are also able to answer Tier 1 calls. The call center's phone system will first route any Tier 2 calls to a CSR II trained in that queue. If there are no callers waiting in a CSR II's Tier 2 queues, the system will instead send Tier 1 calls to that CSR II.

### b. Plaintiff's Current Position

Plaintiff now works at MC 311 as a CSR II. She is assigned only one of the Tier 2 queues, HHS calls. Unlike other CSR IIs, Plaintiff does not receive Tier 1 calls because she cannot currently access the internal portal of the Seibel system or the interactive maps. Because she can only answer Tier 2 HHS calls, Defendant has set the phone system to make Plaintiff the primary recipient in the queue of these calls; no other CSR II will receive a Tier 2 HHS call unless Plaintiff is occupied. In addition to the Tier 2 HHS calls she is currently receiving, Plaintiff has the capability to receive Tier 1 calls for the HHS department. Plaintiff has not been trained to take other types of calls.

Plaintiff looks up information and submits service requests using a screen reader called JAWS, an acronym for Job Access With Speech, which reads aloud to a blind user the information that is displayed on a screen for sighted users. JAWS also allows a blind user to set shortcuts for navigating a page using specific key combinations, which helps users bypass the default navigation of the page that sometimes leads through cumbersome paths or to dead-ends. The process of setting up JAWS to read and navigate a page effectively is called "scripting." Plaintiff uses a customized JAWS-scripted public portal on a non-public County application designed for her. The parties refer to this system as the Internal Web Accommodation Application ("IWAA").

Plaintiff's CSR II role differs from that of other CSR IIs in a variety of ways. Most importantly, Plaintiff does not have access to the Seibel system's internal portal, the CTI Toolbar, or the specialized maps, and, therefore, Plaintiff is not assigned to answer any general Tier 1 calls. Additionally, there are several differences between the tools Plaintiff uses to respond to her Tier 2 HHS inquiries and the tools that other CSR IIs answering the same calls use. CSR IIs using the CTI Toolbar receive the caller's name and zip code from the Tier 1 CSR who transferred the caller into the HHS Tier 2 queue, but Plaintiff does not receive this information and must ask the

caller for it herself. While the internal portal creates a service request number for other CSRs at the beginning of the request creation process, the IWAA does not produce a service request number until the request has been submitted. As a result, Plaintiff must fully submit the request before ending the call in order to provide the caller with the service request number for future reference. To review and correct her requests after hanging up the call, a process referred to as "quality review," Plaintiff must ask her supervisor to process any changes. Other CSRs also have the capability to telework, but Plaintiff does not. Finally, the CTI Toolbar interfaces with the County's phone system to notify sighted CSRs of their status in the queue – that is, whether they are ready to receive calls – using what the County calls AUX codes. Plaintiff did not have a method of accurately checking her AUX code status until the County implemented a new system for her during the evidentiary hearing.

Defendant's fact witnesses testified as to the numerous ways that Defendant has already accommodated Plaintiff in her role as a CSR II. First, to facilitate Plaintiff's new role, the County moved from HHS to MC 311 her computer, JAWS screen reader software, and other equipment, including a braille display and printer. The County hired a contractor to script the HHS Tier 2 software database, CARES, for a JAWS user. It

also hired Thomas Logan, Defendant's accessibility expert witness, to educate several employees, including Mr. Turner and Mr. Sinkler, about JAWS usage so that they could train and manage Plaintiff. Second, Defendant has customized a series of applications to enable Plaintiff to enter service requests. When Plaintiff was initially transferred to MC 311, she was given an Excel spreadsheet with the KBAs and instructed to submit service requests on behalf of callers through the public portal of Seibel. This workflow design proved to be difficult for Plaintiff because she had to answer a CAPTCHA with each request. CAPTCHA, the robot-preventing software that typically shows a picture of a number or word and asks the user to type that number or word into a blank field, has an accessible solution for blind users, but, for reasons not discussed by the parties, Plaintiff was unable to answer the CAPTCHA correctly on a consistent basis. In order to resolve the CAPTCHA issue, Defendant's DTS employees developed and implemented the IWAA, which allowed Plaintiff to submit requests through a similar, but non-public, portal without answering a CAPTCHA. Because the IWAA was a custom solution tailored especially to Plaintiff, it was designed to allow her to access the content necessary to respond to incoming HHS requests using fewer keystrokes and JAWS shortcuts.

Third, the County has spent extensive time training Plaintiff for her current role. During the customary ten-week training period for a CSR, Plaintiff received one-on-one training whereas other employees are typically trained in groups of around eight. For reasons disputed by the parties, Plaintiff's job performance at MC 311 has not met the call center's standards, and the County has continued to provide her with further training after the initial classes. Mr. Sinkler testified that Plaintiff has had difficulty with identifying the caller's issue, providing accurate information to the caller, documenting calls and requests appropriately, exercising proper tone and demeanor, and efficiently managing her calls and workload. (*See* DTX 50).[3] He and Mr. Daniel testified that Plaintiff has generally refused to take notes during training and has frequently relied on her own memory, as opposed to the KBAs, leading to her providing information to callers that is incorrect or outdated. She remains on a work improvement plan because of these issues.

Mr. Sinkler also testified that, in addition to the Tier 2 HHS calls she is currently receiving, Plaintiff has been trained to use the IWAA to respond to Tier 1 calls for the HHS department. In order to limit the Tier 1 calls routed to

---

[3] The designation "DTX" refers to exhibits offered by Defendant.

Plaintiff to calls for HHS inquiries, the County set up the "press four option," allowing a caller to press the four button to be routed directly into an HHS queue that was sent to Plaintiff first. When the County implemented the press four option, however, Plaintiff was overwhelmed by the number of calls she received. The County therefore withdrew the press four option, although the technical capability still exists.

The parties' experts testified as to whether, how, and at what costs certain MC 311 systems could be made accessible to Plaintiff. Defendant's expert Mr. Logan testified that he identified the thirteen accessibility issues with Seibel. He recommended implementing a native solution – a solution incorporated into a newer version of the software made by the manufacturer – such as IP 16, as opposed to JAWS scripting, which he considered more "fragile." Plaintiff's expert Daniel Buchness testified that he tested the Seibel system currently in use at MC 311 for the thirteen accessibility errors identified by Mr. Logan and for any unidentified errors. He estimated that it would cost a total of $63,050.43 to use JAWS scripting to remediate the errors he found, that the scripting could be implemented in 3-5 weeks, and that the scripting changes would "most likely" be compatible with upgrades from Oracle like IP 16. Mr. Buchness acknowledged that one of the issues, the application or browser "hanging" and "crashing" – that is,

lagging behind the user, freezing, or closing unexpectedly – would likely be improved, but not entirely resolved by his proposed repairs.

Plaintiff's experts Shiri Azenkot and Charles LaPierre testified that the data used in the maps identified as necessary to answering Tier 1 calls could likely be made accessible to a blind user. Based on Mr. LaPierre's estimates, it would cost somewhere between $258,300 and $447,300 to makes these maps accessible.

Mr. Logan also demonstrated the difference between using Seibel and using the IWAA to submit a hypothetical HHS request pertaining to an eviction notice. He concluded that the IWAA was better sequenced, required fewer steps, and took less time. Plaintiff herself acknowledged that the IWAA makes it easier for her to access KBAs and submit requests. Mr. Klinger testified that adding more KBAs to the IWAA would not cost the County any additional money.

## IV. Findings of Fact and Conclusions of Law

### a. Injunctive Relief

Plaintiff seeks a permanent injunction requiring the County to make the Seibel system's internal portal and the data from the commonly used maps accessible to her so that she can answer Tier 1 calls like all other CSR IIs do. Specifically, she asks for an order requiring the County to: (1) use JAWS scripting as

necessary to make the Seibel system fully accessible to her within 60 days; (2) upgrade to IP 16, which Oracle suggests should fix most or all of the accessibility issues Plaintiff complains of, by the end of the 2017 calendar year; (3) make accessible the maps she would need most often within 18 months; and (4) assign Plaintiff all of the duties of a CSR II, including Tier 1 calls. She also seeks an order requiring the County to replace Munis and Hansen, programs used by CSR IIs in other Tier 2 queues, with accessible versions when they become available. Finally, she asks that the court order Defendant to maintain the accessibility of all software that is currently accessible.

### i. The Effect of the Jury Verdict

Plaintiff first argues that the County must make the changes she has requested because the jury made its determination based on the proposed duties of a CSR that she posited in the jury trial. She contends that, after the jury verdict, it is "indisputable that had Defendant met its obligations under Section 504, the software at MC311 would be accessible and Plaintiff would be working at MC311 as a CSR II also answering [Tier 1] calls." (ECF No. 295-1, at 8). Plaintiff acknowledges that she is not automatically entitled to equitable relief based on the jury's findings, but contends nevertheless that, "because she proved that she is the victim of

18

discrimination[,] she is entitled to an injunction to prevent the ongoing harm she is suffering." (ECF No. 316, at 5).

Here, the jury verdict was based on whether Plaintiff's role at ADS was an equal employment opportunity to that of her peers who had been transferred to CSR positions at MC 311. Making the accessibility changes Plaintiff now seeks would be one way for Defendant to comply with the ADA requirements, but the law is clear that the employer has the ultimate discretion to choose between effective accommodations. *Reyazuddin v. Montgomery Cty. Md.*, 789 F.3d 407, 415-16 (4th Cir. 2015) (citing *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996); EEOC Interpretive Guidance on Title I of the ADA, 29 C.F.R. § 1630 app. (2014)). If Defendant had failed to offer Plaintiff any accommodations since those considered by the jury, Plaintiff's request for injunctive relief based on the verdict would have force. In light of the CLB job offer and, more importantly, Plaintiff's current position as a CSR at MC 311, neither of which were considered by the jury, the verdict no longer provides any insight as to the "ongoing harm she is suffering." Thus, that verdict is insufficient to dictate the outcome of Plaintiff's pending claim for injunctive relief.

### ii. Applicable Legal Standard

The statutory provisions governing injunctive relief under the ADA come from Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.* ("Title VII"). *See* 42 U.S.C. § 12133 (referring to 29 U.S.C. § 794a, which in turn refers to 42 U.S.C. § 2000e-5, the enforcement and remedies provisions of Title VII). The Supreme Court has held that the primary objective of Title VII was the prophylactic aim "to achieve equality of employment opportunities and remove barriers that have operated in the past." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30 (1971)). Another purpose of the statute is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.* at 418. Therefore, after finding that an employer discriminated against an employee, a court generally has a duty to "render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Id.* (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965)).[4]

---

[4] In *Albemarle Paper Co.*, the Court was considering whether backpay money damages were an appropriate remedy in addition to injunctive relief. Because employers "would have little incentive to shun practices of dubious legality" without the prospect of money damages, the Court found that those damages were necessary to effectuate Title VII's prophylactic goal. 422 U.S. at 418, 421-22. Although this case conversely considers whether injunctive relief is necessary after a damages determination, the Court's focus on "the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination" still guides the instant case. *Id.* at 421.

Injunctive relief thus serves two distinct purposes: to stop ongoing discrimination and to prevent future discrimination.

The United States Courts of Appeals are divided as to the correct approach – which party has the burden of proving what – that governs a claim for injunctive relief after a plaintiff has proven discrimination. The Fifth and Ninth Circuits have held that, "absent clear and convincing proof of no reasonable probability of further noncompliance with the law[,] a grant of injunctive relief is mandatory." *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 354 (5th Cir. 1977); *accord EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987) ("Generally, a person subjected to employment discrimination is entitled to an injunction against future discrimination unless the employer proves it is unlikely to repeat the practice." (citations omitted)). The Second, Eighth, and Tenth Circuits have held that "[t]here is no presumption that broad injunctive relief . . . should issue upon a finding of intentional discrimination." *EEOC v. Siouxland Oral Maxillofacial Surgery Assocs., LLP*, 578 F.3d 921, 928 (8th Cir. 2009); *accord Bridgeport Guardians Inc. v. City of Bridgeport*, 933 F.2d 1140, 1149 (2d Cir. 1991) (holding that a court has broad power "to fashion the relief it believes appropriate" after establishing a Title VII violation); *EEOC v. Gen. Lines, Inc.*, 865 F.2d 1555, 1565 (10th Cir. 1989).

The case of *Spencer v. General Electric Co.*, 894 F.2d 651 (4th Cir. 1990), *abrogated on other grounds by Farrar v. Hobby*, 506 U.S. 103 (1992), guides the analysis of cases like these in the Fourth Circuit.  In *Spencer*, the plaintiff in a sexual harassment case proved her hostile work environment claim and was awarded nominal damages.  *Spencer v. Gen. Elec. Co.*, 703 F.Supp. 466, 469 (E.D.Va. 1989).  On the plaintiff's motion for injunctive relief, the district court found that an injunction was not mandatory and articulated the following governing principles:

> Injunctive relief is uniquely designed to prevent illegal conduct.  Such relief, however, is not mandatory in all Title VII cases.  Only where there are lingering effects or a not insubstantial risk of recurring violations is such relief necessary.  At the same time, injunctive relief is not automatically precluded simply because the offending party has ceased the illegal conduct, demonstrated its good faith intent to comply with the law, or even implemented an affirmative plan to remedy past discrimination.  Rather, the court must carefully examine the circumstances of each case, taking into account "the bona fides of [defendant's] expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *United States v. W.T. Grant*, 345 U.S. 629, 633 (1953).  Before granting injunctive relief, the court must then conclude that a "cognizable danger of recurrent violation" exists.  *United States v. Hunter*, 459 F.2d 205, 210 (4th Cir. 1972) [citing *W.T. Grant Co.*, 345 U.S. at 633].

703 F.Supp. at 469-70 (alterations in original). The district court also emphasized the difference between cases where there was "abundant evidence of past discrimination," "widespread misconduct or lingering effects," or "a systematic pattern of harassment" and cases like Spencer's sexual harassment claim where the "illegal conduct was precipitated by a single individual within a relatively small and isolated working group." 703 F.Supp. at 469 nn.4, 9.

In evaluating these claims, the court also noted:

> Plaintiff relies on *W.T. Grant Co.* for the proposition that defendant bears a heavy burden to defeat injunctive relief by demonstrating "there is no reasonable expectation that the wrong will be repeated." *United States v. W.T. Grant Co.*, 345 U.S. at 633. That reliance, however, is misplaced and the quotation taken out of context. In *W.T. Grant Co.*, the Supreme Court did place a heavy burden on defendant, but only to prove that [the] case was mooted by the cessation of the alleged illegal activity, thereby depriving the court of jurisdiction. Here, the issue is not subject matter jurisdiction, but rather the appropriate remedy after a finding of liability. *Id.* Once Title VII liability has been established, it is reasonable to shift to defendant the burden to come forward with evidence of remedial measures, as well as evidence to show that the violations will not recur. After all, defendant is in the best position to provide such evidence. The ultimate burden of persuasion may equally reasonably remain with plaintiff.

703 F.Supp. at 469 n.10. Because the defendant in *Spencer* had shown "a genuine, not transitory, commitment to banning sexual harassment in the workplace" by instituting a new sexual harassment policy, the court found that an injunction was unnecessary. 703 F.Supp. at 471, 473.

On appeal, the Fourth Circuit affirmed as to the plaintiff's motion for injunctive relief. *Spencer*, 894 F.2d at 661. It agreed that, "[a]lthough injunctions are by no means mandatory in a Title VII case, a district court must, of course, exercise its discretion in light of the prophylactic purposes of the Act to ensure that discrimination does not recur." 894 F.2d at 660. Like the district court, the Fourth Circuit underscored the difference between "systematic company-wide discrimination" and "isolated incident[s]." 894 F.2d at 661. It affirmed the district court's determination that "once Title VII liability was established, the onus to produce evidence that [discrimination] will not recur lies with the defendant[.] However, the ultimate burden of proof that an injunction is necessary always remains with the plaintiff." 894 F.2d at 660 n.13.

Accordingly, the two questions from *Albemarle Paper Co.* must be answered in this case: first, whether, by placing Plaintiff in her current position at MC 311, Defendant has provided her a reasonable accommodation for her disability,

ceased its discrimination, and "eliminate[d] the discriminatory effects of the past;" and second, whether an injunction is necessary to prevent further discrimination in the future. Defendant has the burden of providing evidence both that the County has ceased discriminating against Plaintiff and that further discrimination against Plaintiff is unlikely to recur. Plaintiff, however, bears the ultimate burden of showing entitlement to injunctive relief in light of Defendant's evidence.

### iii. Injunctive Relief for Ongoing Discrimination

In her proposed injunctive order, Plaintiff seeks further changes to accommodate her in her current position. Essentially, Plaintiff's request for injunctive relief is a claim that the County still has not provided her with a reasonable accommodation despite her current placement. Plaintiff suggests that the County has provided only a "partial accommodation" and that she continues to suffer from discrimination because Defendant has assigned her limited duties and provided her insufficient technological tools compared to her CSR II peers at MC 311. (*See* ECF No. 316, at 6-7). To accommodate her completely, she argues, the County must enable her to answer Tier 1 calls. Defendant argues that no further action is needed to accommodate Plaintiff, although the County notes that it has contracted to implement IP 16 for Seibel,

which it expects will make the system accessible to Plaintiff, and that it intends to make maps accessible on a yet-to-be-determined schedule.

Unlike typical ADA cases, in which plaintiffs seek to limit the scope of their work to avoid tasks made difficult or impossible due to their disabilities, Plaintiff is seeking to expand her job duties. Defendant, on the other hand, is arguing that the County has reasonably accommodated Plaintiff by putting her at MC 311 as a CSR II answering HHS Tier 2 calls even if her job responsibilities are limited compared to her peers. In some instances, the parties have even changed course from their positions during the jury trial earlier in this case. For example, where Defendant sought at trial to show that reading maps was an essential CSR function of which Plaintiff was incapable, it now argues that it has accommodated her without the need for her to read maps, and therefore it should not be ordered to make its maps accessible.

Although the parties' roles may be unusual, the guideposts for accommodation remain the same. To prevent discrimination by employers, the ADA requires that employers provide a reasonable accommodation when the disabled employee is capable of performing the essential functions of the job with such an accommodation. 42 U.S.C. § 12111(8); *EEOC v. Stowe-Pharr Mills,*

*Inc.*, 216 F.3d 373, 377 (4th Cir. 2000).  As the House Report on

the matter states:

> [T]he reasonable accommodation
> requirement is best understood as a process
> in which barriers to a particular
> individual's equal employment opportunity
> are removed.  The accommodation process
> focuses on the needs of a particular
> individual in relation to problems in
> performance of a particular job because of a
> physical or mental impairment.
>
> . . .
>
> Having identified one or more possible
> accommodations, the [next] step is to assess
> the reasonableness of each in terms of
> effectiveness and equal opportunity.  A
> reasonable accommodation should be effective
> for the employee.  Factors to be considered
> include the reliability of the accommodation
> and whether it can be provided in a timely
> manner.
>
> .  .  . [A] reasonable accommodation
> should provide a meaningful equal employment
> opportunity.  Meaningful equal employment
> opportunity means an opportunity to attain
> the same level of performance as is
> available to nondisabled employees having
> similar skills and abilities.

H.R. Rep. 101-485(II), *as quoted in Bryant v. Better Business
Bureau of Greater Md., Inc.*, 923 F.Supp. 720, 736-37 (D.Md.
1996).  Accordingly, "[i]n order to be reasonable, the
accommodation must be effective (i.e., it must address the job-
related difficulties presented by the employee's disability),
and it must allow the employee to attain an 'equal' level of
achievement, opportunity, and participation that a non-disabled

individual in the same position would be able to achieve."
*Merrill v. McCarthy*, 184 F.Supp.3d 221, 236 (E.D.N.C. 2016)
(quoting *Fleetwood v. Harford Sys. Inc.*, 380 F.Supp.2d 688, 699
(D.Md. 2005)); *see also Bryant*, 923 F.Supp. at 736; 29 C.F.R.
pt. 1630, app. (2014) ("The reasonable accommodation that is
required by this part should provide the individual with a
disability with an equal employment opportunity. Equal
employment opportunity means an opportunity to attain the same
level of performance, or to enjoy the same level of benefits and
privileges of employment as are available to the average
similarly situated employee without a disability.").

On the other hand, an employer "may reasonably accommodate
an employee without providing the exact accommodation that the
employee requested." *Reyazuddin*, 789 F.3d at 415. Under the
ADA, reasonable accommodations may include "job restructuring,
part-time or modified work schedules, reassignment to a vacant
position, acquisition or modification of equipment or devices,
[or] appropriate adjustment or modifications of examinations,
training materials or policies." 42 U.S.C. § 12111. As noted
above, the employer has discretion to choose between effective
accommodations, *Reyazuddin*, 789 F.3d at 415-16, and a court goes
too far when the effect of an injunction "would be to give
preferential treatment to people with disabilities, rather than
put them on equal footing as intended by Congress," *Pathways*

*Psychological v. Town of Leonardtown, Md.*, 223 F.Supp.2d 699, 717 (D.Md. 2002).

When this case began, Defendant had assigned Plaintiff, in the words of the Fourth Circuit, a "cobbled together [] assortment of 'make-work' tasks" that were of questionable value to the County and failed to fill up her day. *Reyazzudin*, 789 F.3d at 416. It was these job duties that failed to constitute a reasonable accommodation for Plaintiff because they did not provide her a meaningful equal employment opportunity. The jury's verdict was based on those limited duties.

Since then, Plaintiff has been transferred to MC 311 and classified as a CSR II. She is answering Tier II HHS calls full time. None of the work she is presently doing is "make-work." In her current position, she assists callers with an array of HHS requests that would otherwise be resolved by other CSR IIs at MC 311. Her work is related to a subject matter with which she has familiarity and the potential to capitalize on her years of HHS experience. Although Plaintiff and Defendant appear to be in an ongoing effort to find the right workload for her as a CSR – and the parties dispute her skills, training, and progress - she no longer complains that she has an insufficient workload. If her Tier II HHS calls were to become insufficient, the County has in place another accommodation, the "press four option," to increase her total number of calls to ensure that she can fill

her days with meaningful work that would otherwise be done by her peers at MC 311. The issues Plaintiff now presents are considerably different from those that were previously in front of the jury. This evidence shows that Plaintiff is now doing meaningful work.

Plaintiff argues, however, that the work assigned to her does not provide her with an equal employment opportunity because the tools she is using and tasks she is assigned differentiate her from her peers and limit her performance. She contends that using the IWAA sets her up to fail because she cannot easily do "quality review" to check her work. Plaintiff also emphasizes that the IWAA requires her to ask the caller for name and zip code information that would normally be transferred to the CSR II by the Tier 1 call-taker. She argues that this redundant request requires her to take more time on each call than her peers. Finally, Plaintiff points out that the unavailability of the Seibel system prevents her telecommuting, which at least some of her peers can do for a variety of reasons. Defendant argues that none of these differences prevent Plaintiff's current role from being a reasonable accommodation.

Although Plaintiff may not be doing the exact same work in the exact same way as her non-disabled peers, her current position at MC 311 does provide her with a meaningful equal

employment opportunity.  The current circumstances of this case are somewhat similar to those in *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682-83 (7th Cir. 2014), where a legally blind employee at a Dairy Queen restaurant was assigned exclusively to one department instead of rotating through various departments as non-disabled employees in the same position were required to do.  Although the plaintiff sought a different accommodation, the court found that permitting and assigning him to work exclusively in one department where he was best able to perform all the necessary duties was "exactly the kind of accommodation envisioned by the regulations applicable to the ADA" when they reference "job restructuring" or a "modified work schedule," even if it meant that his job was structured differently from his peers.  *Id.*  Similarly, here, the County has restructured Plaintiff's CSR job to handle exclusively the calls that she is most capable of handling with the tools that are currently accessible.

Plaintiff largely argues that answering Tier 1 calls is an essential function of the CSR II position and that the County must provide an accommodation sufficient for her to perform all essential functions of the CSR II position in the same manner as her peers.  Neither the statute nor case law imposes such a requirement.  In *Basith v. Cook County*, 241 F.3d 919, 924-25 (7th Cir. 2001), for example, the plaintiff's employer restructured

his job as a Pharmacy Technician II to eliminate delivery, stocking, and cleaning duties when an injury left him unable to do much walking or lifting. Although the court had found that delivery and stocking of medications were essential functions of his job, *id.* at 927, it held that the employer had provided a reasonable accommodation when it "went above and beyond the requirements of the ADA" by reallocating these essential functions to other employees, *id.* at 932; *cf. Feist v. La. Dep't of Justice*, 730 F.3d 450, 453-54 (5th Cir. 2013) (emphasizing that "a modification that enables an individual to perform the essential functions of a position is only one of three categories of reasonable accommodation," along with modifications that enable an applicant to be considered for a desired position or modifications that enable a disabled employee "to enjoy equal benefits and privileges of employment" (citing 29 C.F.R. § 1630.2(o)(1))); *EEOC v. Life Techs. Corp.*, No. WMN-09-2569, 2010 WL 4449365, at *5 (D.Md. Nov. 4, 2010) (noting in a different context that, although "the regulation certainly indicates that some reasonable accommodations are for the purpose of enabling an individual to perform the essential functions of a job, nothing in its language indicates that all reasonable accommodations must be for that purpose"); Interpretive Guidance, 29 C.F.R. § 1630 app. (2016) (explaining that restructuring essential functions to enable an individual

to perform a job is one type of modification that might be required in a "supported employment" position and noting that "it would not be a violation of [the reasonable accommodation requirement] for an employer to provide any [such] personal modifications or adjustments"). This view is also supported by the ADA's inclusion of reassignment to a vacant position, which would inherently change the essential functions of the job held, as a reasonable accommodation, so long as the employee is able to perform the essential functions of the new position and the position is equivalent to the employee's previous one. Interpretive Guidance, 29 C.F.R. § 1630 app. (2016).

The evidence here does not show that using the IWAA and answering only Tier 2 HHS calls prevents Plaintiff from attaining the same level of performance as her peers. The queue of calls Plaintiff receives has no bearing on her salary, job benefits, union status, or any other privileges of her employment, with the possible exception of the opportunity to telework. Telecommuting, however, is permitted only in limited circumstances and at the discretion of a supervisor, not as of right. Plaintiff is also capable of doing quality review of her service requests and figuring out her AUX code status, just under different circumstances than her peers. As described in the job classification, the role of a CSR II focuses almost entirely on general skills related to helping callers:

identifying problems, researching written materials, providing information to the customer, and submitting service requests. (DTX 7). It makes no reference to the specific types of calls a CSR II will answer. (*Id.*). Although all other CSRs are able to answer Tier 1 calls, all CSR IIs are limited to taking only the Tier II calls for the systems on which they are trained; thus, not all CSR IIs need to answer the same types of calls in order to attain the same level of performance.

The same analysis applies to Plaintiff's promotional opportunities. Plaintiff has not presented any evidence that her lack of familiarity with Seibel's internal portal will detract from her future opportunities if she shows a strong ability to assist callers and the interpersonal skills necessary to train new CSRs, manage employees, and handle difficult calls. To the contrary, the testimony of Robert Sinkler and other managers indicated that it is common for MC 311 supervisors to be unfamiliar with the Tier 2 calls from queues in which they did not work, yet these employees are still eligible to be promoted to supervise CSR IIs who take such calls.

In sum, the differences between Plaintiff working as a CSR II using the IWAA to answer only Tier 2 HHS calls and her Seibel-using peers are within the range of modifications "to the manner or circumstances under which the position . . . is customarily performed" that regulations permit as part of a

reasonable accommodation. 29 C.F.R. § 1630.2(o)(1)(ii).
Plaintiff's current role allows her to attain an equal level of
achievement, opportunity, and participation as her CSR II peers.
The County has provided her a reasonable accommodation, and,
accordingly, its discriminatory conduct has ceased. Therefore,
an injunction is not warranted as to Plaintiff's current
position.[5]

### iv. Prohibitory Injunction

Even where an employer has stopped discriminating against
an employee, "the court's power to grant injunctive relief
survives discontinuance of the illegal conduct." *W.T. Grant
Co.*, 345 U.S. at 633; *accord Reiter v. MTA N.Y.C. Transit Auth.*,
457 F.3d 224, 230 (2[d] Cir. 2006). As discussed above, "the court
must carefully examine . . . 'the bona fides of [defendant's]
expressed intent to comply, the effectiveness of the
discontinuance and . . . the character of the past violations.'"

---

[5] At the hearing, the parties also presented testimony and
exhibits related to the CLB job offer. The evidence showed that
the CLB position would have been isolated from other County
employees and was created and offered in a manner that deviated
significantly from normal County or CLB practices. It therefore
seems doubtful that such a position would have provided
Plaintiff with a reasonable accommodation. Because Plaintiff's
current position satisfies the ADA requirements, however, there
is no need for injunctive or declaratory relief based on a
failure to accommodate related to the CLB offer.

*Spencer*, 703 F.Supp. at 469-70 (quoting *W.T. Grant*, 345 U.S. at 633) (alterations in original).

Plaintiff argues that a prohibitory injunction is necessary to prevent Defendant from letting its current accessibility lapse and returning to its former discriminatory practices. She argues that despite Defendant's ongoing efforts to accomplish Seibel accessibility through IP 16, the County has made such strides for accessibility reluctantly and only as a result of this litigation. It should not be trusted, Plaintiff maintains, to continue its accessibility efforts or to make such efforts a timely priority in the absence of a court order.[6] In her motion papers, Plaintiff suggests that, rather than "acknowledging its

_____

[6] In her motion papers, Plaintiff does not distinguish between the analysis of mootness in this case and her entitlement to a prohibitory injunction. Put another way, Plaintiff contends that because her transfer did not moot the case, Defendant should be enjoined from transferring Plaintiff back out of MC 311 or taking actions that negate the accessibility measures it has undertaken to allow her to work as a CSR II. Without citing to any cases equating these two analyses, Plaintiff states that "[w]hat is appropriate for a mootness analysis is equally applicable to the question of whether injunctive relief is appropriate." (ECF No. 295-1, at 10). She is incorrect. The mootness analysis determines whether a court has jurisdiction to hear a case. The existence of a live controversy is not enough to entitle Plaintiff to relief. Thus, where voluntary cessation might prevent a court from mooting a case when a defendant is capable of reverting back to past practices, to warrant injunctive relief, Plaintiff must show, not that Defendant *is capable* of reverting back to past discriminatory practices, but some *likelihood* of recurrence. *See Spencer*, 703 F.Supp. at 469 ("Only where there are lingering effects or a not insubstantial risk of recurring violations is such relief necessary.").

failings, Montgomery County is still conducting a battle to hold onto what it regards as its management rights to do anything it wants." (ECF No. 316, at 12).

In *Spencer*, the Fourth Circuit refused to adopt the rule "that remedial measures undertaken by a defendant after the instigation of litigation will never be adequate to obviate injunctive relief" because doing so would "undercut the remedial goals of Title VII . . . by removing any incentive for an employer, once sued, to clean its own house." 894 F.2d at 660-61. Moreover, the County has never contended that it need not accommodate Plaintiff. Defendant and Plaintiff have disputed what constitutes a reasonable accommodation, and Defendant has continued to maintain, as the law makes clear, that an employer has discretion to choose among effective accommodations. These arguments are a far cry, however, from the notion that the County may "do anything it wants." Defendant has offered Plaintiff two positions different from what it originally "wanted" to provide. Nor has the County been slow to provide the accommodations it believed were necessary. Rather, in both instances, Defendant offered Plaintiff a new position before it was necessary and while it was still litigating the sufficiency of its earlier accommodation efforts: before the jury found that Plaintiff's ADS positions were inadequate, the County helped create a new position that it thought would appeal to Plaintiff

at the CLB, and while the parties were litigating the adequacy of the CLB position, Defendant transferred Plaintiff to MC 311. Defendant has also made continued efforts to improve the effectiveness of Plaintiff's placement at MC 311. The County has dedicated extensive time and personnel to training Plaintiff on the skills she needs for her position. After encountering issues with the CAPTCHA robot-prevention software, it created the IWAA, a specialized portal for Plaintiff.

All of these steps indicate a *bona fide* intent to abide by the law. Defendant's past actions do not suggest an unwillingness to provide a reasonable accommodation, but rather a repeated failure to identify one that works for both Plaintiff and the County. Defendant did not fail to recognize that an accommodation was required. Rather, it failed to provide an accommodation that met the requirements of the ADA.

There are no other reasons to conclude that a prohibitory injunction is necessary. The "character of the past violation" is delimited; the violation was isolated in the sense that it was caused by the one-time reorganization of the call center functions. Other evidence Defendant put forth at the evidentiary hearing indicates that it has now invested significant training toward helping Plaintiff succeed in her new role, despite numerous issues. Defendant also has a contract in place to implement IP 16 and has indicated that it expects this

upgrade to fix the accessibility issues that have prevented Plaintiff from using Seibel's internal portal. Thus, the County appears inclined to continue to implement further accessibility features.

Plaintiff's contention that Defendant might fail to maintain the accessibility of the systems she is presently using seems improbable. Some of the accessibility features result from software advances that serve multiple purposes. The costs and resources necessary to maintain accessibility of the systems currently in place would likely be minimal compared to the staff time and resources that the County has already invested in making the CSR II position accessible to Plaintiff. Additionally, if Defendant failed to maintain the accessibility of the CARES system or the IWAA, Plaintiff would not be able to help any customers at all. The County has never suggested that paying Plaintiff to do nothing at all would be appropriate. The County has discontinued its discrimination, which was only the failure to identify and implement a reasonable accommodation. Considering all of these circumstances, a prohibitory injunction is not warranted.

### b. Declaratory Judgment

Plaintiff also seeks a declaration, based on the jury verdict, that Defendant violated her rights under the ADA. The Fourth Circuit has explained that:

While § 2000e-5(g)(2)(B)(i) places the power to award declaratory relief in the district courts' discretion, "such discretionary choices are not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *Albemarle Paper Co.*, 422 U.S. at 416 (internal quotation marks omitted).

*Pitrolo v. Cty. of Buncombe, N.C.*, 589 F.App'x 619, 627 (4th Cir. 2014). The court further explained that:

"We have . . . enumerated several factors to guide district courts in their exercise of this discretion." *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 421-22 (4th Cir. 1998) (*per curiam*) (internal quotation marks omitted). In *Aetna*, we held that, when deciding whether to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, a district court should consider several factors. *See Aetna*, 139 F.3d at 422-24. Among those factors relevant to this case are whether awarding declaratory relief (1) will clarify important issues of law in which the forum state has an interest; (2) will "clarify the legal relations between the parties" or afford "relief from uncertainty, insecurity, and controversy giving rise to the proceeding"; and (3) "whether the declaratory judgment action is being used merely as a device for procedural fencing." *Id.* (internal quotation marks omitted); *see also Am. Cas. Co. of Reading, Pa. v. Howard*, 173 F.2d 924, 927 (4th Cir. 1949) ("We think [judicial discretion whether to grant declaratory relief] should be liberally exercised to effectuate the purposes of the [Declaratory Judgment Act] and thereby afford relief from uncertainty and insecurity with respect to rights, status and other legal relations."); [] Edwin Bouchard, Declaratory Judgments 299 (2d ed. 1941) ("The two principal criteria guiding the policy in favor of rendering declaratory

> judgments are (1) when the judgment will
> serve a useful purpose in clarifying ... the
> legal relations at issue and (2) when it
> will ... afford relief from the uncertainty,
> insecurity, and controversy giving rise to
> the proceeding.").

*Pitrolo*, 589 F.App'x at 627-28.

In her motion papers, Plaintiff contends that a declaration from the court "will afford relief to both parties about the uncertainty, insecurity, and controversy that gives rise to this case." (ECF No. 316, at 14). A declaration is warranted, she argues, because "the parties have strong disagreements about the way in which their future relations should be organized." (*Id.*). Plaintiff contends that *Pathways Psychological v. Town of Leonardtown, Md.*, 223 F.Supp.2d 699, 718 (D.Md. 2002), demonstrates that a court may enter a declaratory judgment even after a jury determination of the same issue on the merits. In that zoning and land use case, the court issued a declaratory judgment because it was "not in a position to determine whether Pathways' current use [was] different from that use [upon which the jury determination relied]." *Id.* at 717. The court issued a declaration stating that, if the plaintiff's ongoing use was the same, the jury's verdict continued to control.

In the instant situation, there is no such confusion. The jury made clear that Defendant's earlier accommodation was insufficient. The County has now provided Plaintiff with an

entirely new accommodation that is compliant with the ADA. Further expounding on the jury's verdict would be superfluous and have no bearing on the current legal issues. Moreover, by addressing Plaintiff's claims for injunctive relief, the court has removed any uncertainty, insecurity, and controversy over Defendant's future obligations as Plaintiff's employer. Accordingly, declaratory relief is not appropriate here.

## V. Conclusion

For the foregoing reasons, judgment will be entered in favor of Defendant Montgomery County, Maryland on Plaintiff Yasmin Reyazuddin's requests for injunctive and declaratory relief. A separate order will follow.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge
