IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

YASMIN REYAZUDDIN                        :

                                         :

    v.                                   :   Civil Action No. DKC 11-951

                                         :

MONTGOMERY COUNTY, MARYLAND               :

                                         :

**MEMORANDUM OPINION**

Pending and ready for resolution in this Rehabilitation Act case is the motion of Plaintiff Yasmin Reyazuddin for an award of attorneys' fees, expenses, and costs. (ECF No. 426). The issues have been briefed, and the court now rules, no hearing being necessary. Local Rule 105.6. Because Ms. Reyazuddin obtained sufficient relief to warrant attorneys' fees, her motion will be granted in part, and the court will award $837,923.49 in attorneys' fees, expenses, and costs.[1]

## I.   Background

Plaintiff Yasmin Reyazuddin seeks attorneys' fees from Defendant Montgomery County. The facts of this litigation are recited in more detail in the court's prior opinions. (ECF Nos. 36, 56, 108, 353, and 409). The procedural history is long and need not be detailed in full here. A brief overview follows.

---

[1] Also pending is the Defendant Montgomery County's consent motion to exceed page limits. (ECF No. 430). That motion will be granted.

Ms. Reyazuddin is blind.  She worked as a customer service representative for Montgomery County in the Department of Health and Human Services.  In 2009, the County consolidated its customer service representative employees from all departments into a new call center called MC311, using a computer software that was, at the time, not accessible by blind people.  As a result, Ms. Reyazuddin was not transferred to MC311 at that time.  Instead, the County offered her—and she worked in—several alternate jobs.

Ms. Reyazuddin did not consider the alternate jobs to be commensurate with her prior position, so she sued the County for failure to provide a reasonable accommodation for her disability. She brought claims under the Rehabilitation Act and the Americans with Disabilities Act.  After the court granted summary judgment, (ECF Nos. 108 and 109), and the Fourth Circuit affirmed in part and reversed in part, *Reyazuddin v. Montgomery County* (*Reyazuddin I*), 789 F.3d 407 (4th Cir. 2015), only the Rehabilitation Act claim went to trial.  The jury rejected the County's substantial hardship defense and found that the County had failed to provide Plaintiff a reasonable accommodation, but awarded $0 in damages.  (ECF No. 221).

Following trial, Ms. Reyazuddin sought injunctive relief to remedy the discrimination found by the jury.  She sought an order requiring the County to make MC311 accessible and to give Plaintiff a job as a customer support representative.  (ECF No. 228, at 7).

Before the injunctive relief issue could be resolved, the County transferred her to MC311. (ECF No. 258-1, at 1). Still dissatisfied with the limitations of the position, Ms. Reyazuddin modified her request for injunctive relief. (ECF No. 295). The court denied her request because she was now employed at MC311. (ECF Nos. 353 and 354). Ms. Reyazuddin appealed, (ECF No. 361), and the Fourth Circuit affirmed. *Reyazuddin v. Montgomery County* (*Reyazuddin II*), 754 Fed.App'x. 186 (4th Cir. 2018).

Ms. Reyazuddin then filed a motion for attorneys' fees. (ECF 403). This court denied that motion, reasoning that Ms. Reyazuddin was not a "prevailing party." (ECF No. 409). On appeal, the Fourth Circuit held that she was a prevailing party and remanded. *Reyazuddin v. Montgomery County* (*Reyazuddin III*), 988 F.3d 794, 798 (4th Cir. 2021). Ms. Reyazuddin then filed another motion for attorneys' fees, expenses, and costs. (ECF No. 426). The County opposed the motion, (ECF No. 431), and Ms. Reyazuddin replied. (ECF No. 433).

## II. Availability of Attorneys' Fees

While a party usually must pay its own attorneys' fees, *see Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983), Congress permits fee-shifting in civil rights cases because "the private market for legal services fail[s] to provide many victims of civil rights violations with effective access to the judicial process." *City of Riverside v. Rivera*, 477 U.S. 561, 576 (1986) (citations

omitted).   Indeed, such victims "ordinarily cannot afford to purchase legal services at the rates set by the private market." *Lefemine v. Wideman*, 758 F.3d 551, 555 (4th Cir. 2014) (quoting *City of Riverside*, 477 U.S. at 576).   Thus, the Rehabilitation Act—like many other civil rights statutes—provides a court with discretion to award a prevailing party "a reasonable attorney's fee."   29 U.S.C. § 794a(b).   Ms. Reyazuddin is a prevailing party, *see Reyazuddin v. Montgomery County* (*Reyazuddin III*), 988 F.3d 794 (4th Cir. 2021), and she has thus moved for a fee award.   (ECF No. 426).

Ms. Reyazuddin's prevailing party status means only that she is "eligible for, rather than entitled to," attorneys' fees. *Mercer v. Duke Univ.*, 401 F.3d 199, 203 (4th Cir. 2005).   In a case in which "the judgment lacks significant damages recovery," the prevailing plaintiff may have won a mere "technical" victory "for which the reasonable fee is zero."   *Pitrolo v. County of Buncombe*, 589 Fed.App'x. 619, 630 (4th Cir. 2014) (quoting *Farrar v. Hobby*, 506 U.S. 103, 117 (1992) (O'Connor, J., concurring)).   Thus, to decide attorneys' fees in a case involving little or no damages, a court conducts a two-step inquiry.   *Mercer*, 401 F.3d at 203-12. First, it examines whether the plaintiff's victory is sufficiently "material" to "warrant a[] [fee] award" in the first place.   *Id.* at 204, 207.   Second, if a fee is warranted, the court then calculates a "reasonable" award.   *Id.* at 209.

### A.   Factors to determine if fees should be awarded

To "separate" a mere "technical . . . victory" (for which a fee is not warranted) from a "material" victory (for which a fee is warranted), the United States Court of Appeals for the Fourth Circuit considers three factors adopted from Justice O'Connor's concurrence in *Farrar v. Hobby*, 506 U.S. 103 (1992).  *See Mercer*, 401 F.3d at 203-04 (internal quotation marks omitted).  First, the court considers "the extent of the relief obtained by the plaintiff."  *Id.* at 204.  Second, it examines "the significance of the legal issue on which the plaintiff prevailed."  *Id.* at 206 (internal quotation marks omitted).  And third, it asks "whether the litigation served a public purpose, as opposed to simply vindicating the plaintiff's individual rights."  *Id.* at 207.  A plaintiff need not satisfy all three factors to earn a fee award. *See id.* at 208-09.  Rather, the central question is whether a plaintiff's victory is "technical" or "material," and the *Farrar-Mercer* factors "help" courts make that distinction.  *Id.* at 203-04, 207 (internal quotation marks omitted).

### 1.   Relief Obtained

First, courts examine "the extent of the relief obtained by the plaintiff."  *Mercer*, 401 F.3d at 204.  To evaluate this factor, a court compares the relief a plaintiff sought with the relief she eventually attained.  *Project Vote/Voting for Am., Inc. v. Dickerson*, 444 Fed.App'x. 660, 662 (4th Cir. 2011).  For example,

this factor weighs against a plaintiff where she seeks "only compensatory damages" and receives mere nominal damages. *Kane v. Lewis*, 675 Fed.App'x 254, 258 (4ᵗʰ Cir. 2017).  By contrast, when a plaintiff seeks injunctive relief, "the relevant comparison . . . [is] the scope of the injunctive relief sought to the relief actually granted." *Mercer*, 401 F.3d at 205.

What is more, a fee award is warranted when a plaintiff seeking an injunction persuades the defendant to provide most of the real-world relief the injunction would have provided, making the injunction itself unnecessary. *Project Vote*, 444 Fed.App'x. at 663-64.  For instance, this factor favors a plaintiff where it asks a court to enjoin enforcement of a regulation, and it persuades the government to enter a settlement in which it agrees to stop enforcing the regulation on its own, such that the injunction is no longer needed. *Id.* at 662-64.  A court's later denial of injunctive relief is based on the plaintiff's success in obtaining a timely surrender, rather than her failure to prove the "merits" of her claim. *Id.* at 663; *cf. Farrar*, 506 U.S. at 115, (attorneys' fees not warranted where "a plaintiff recovers only nominal damages because of his *failure to prove an essential element of his claim*") (emphasis added).

Here, this factor favors a fee award because, according to the Fourth Circuit, Ms. Reyazuddin's trial victory caused the County to give her most of the real-world relief she sought, such

that an injunction itself was no longer needed.  In her complaint, Ms. Reyazuddin sought an injunction that would require the County "to reinstate [her] as an information specialist within the [MC311] call center" and to update its software so that the job would be "independently accessible" to her.  (ECF No. 1, at 8).  The Fourth Circuit found that Ms. Reyazuddin's trial victory caused the County to "capitulate" to her demands by "transferring her to MC 311" and providing her accessible software.  *Reyazuddin III*, 988 F.3d at 798.  And it was that timely surrender that made an injunction unneeded: This court declined to grant an injunction because the County had "provided the relief Plaintiff sought" when it "transferred [her] to MC 311" and "ceased" "its discriminatory conduct."  (ECF No. 353, at 6, 29, 35).  All told, Ms. Reyazuddin has achieved sufficient relief to warrant attorneys' fees.[2]

---

[2] This court is less certain than the Fourth Circuit that Ms. Reyazuddin's trial victory was the sole cause of the County's decision to transfer her. In its answer to the original complaint, the County stated that it originally chose not to transfer Ms. Reyazzudin because doing so would be "cost . . . prohibitive." (ECF No. 10, at 4).  That suggests that the County might have later transferred her when accommodating her became more affordable. Indeed, MC311 has other blind employees, (ECF Nos. 431, at 20; 382, at 21, 135, 154-55), and it employs a Technology Manager whose regular job duties include making the County's technology "accessible" and conducting "accessibility training."  (ECF No. 300-14, at 1-2).  Thus, it is possible that—independent of this lawsuit—the County would have made its systems accessible once doing so was no longer cost—prohibitive and would have transferred Ms. Reyazuddin once it completed those accessibility upgrades. The County does not raise any such argument in its papers here. It does not argue that it always planned to transfer Ms. Reyazuddin once it was affordable to do so.  It likewise does not argue that

In a similar case, the Fourth Circuit held that the extent-of-relief factor favored a plaintiff seeking an injunction because the plaintiff had persuaded the defendant to surrender most of the real-world relief that the injunction would have provided. *See Project Vote*, 444 Fed.App'x. at 662-664. In *Project Vote*, the Maryland Transit Administration imposed a rule that barred voting rights groups from registering voters at bus and train stations. *Id.* at 661. Several such groups sued, arguing that the rule was unconstitutional and asking a court to enjoin the government from enforcing it. *Id.* After the suit was filed, the parties entered a preliminary settlement in which the Transit Administration agreed to cease the rule's enforcement. *Id.* The district court later decided that the rule was indeed unconstitutional but declined to grant the requested injunction because the Transit Administration's voluntary cessation of enforcement made it "unnecessary" to enjoin the rule. *Id.* at 663. The Fourth Circuit later held that attorneys' fees were warranted in part because the voting rights group had "br[ought] the [Transit Administration]

---

the accommodations Ms. Reyazuddin sought became more affordable as her suit progressed. Indeed, it does not even attempt to identify any potential alternate cause for the transfer other than its loss at trial. Because the County has done little to suggest that the transfer was anything other than the "timely capitulation" the Fourth Circuit believed it to be, this court adopts that conclusion. *Reyazuddin III*, 988 F.3d at 798.

into a settlement . . . which afforded Plaintiffs most of the equitable relief sought in the complaint." *Id.* at 664.

This case is effectively the same. Here, as in *Project Vote*, Plaintiff sought an injunction. Here, as in *Project Vote*, Defendant voluntarily gave Plaintiff "most of the equitable relief" she requested before a court had a chance to grant an injunction. And here, as in *Project Vote*, that voluntary surrender made the injunction "unnecessary." Thus, just like in *Project Vote*, the extent-of-relief factor "weighs in favor of [the] Plaintiff[]." *Id.* at 664.

The County argues that this factor weighs against Ms. Reyazuddin because she requested added injunctive relief after her transfer, and this court denied that request. (ECF No. 431, at 13-15). That argument sets the bar too high. To be sure, after her transfer, Ms. Reyazuddin argued that the County was required to accommodate her further by upgrading certain software and assigning her added tasks, and she unsuccessfully requested an injunction to force those accommodations. (ECF No. 295-1, at 1-2). But the Fourth Circuit has never held that attorneys' fees are warranted only when a plaintiff obtains every last bit of real-world relief she seeks. To the contrary—the extent-of-relief factor weighs in a plaintiff's favor as long as she obtains "*most* of the equitable relief sought in the complaint." *Project Vote*, 444 Fed.App'x. at 664 (emphasis added). Ms. Reyazuddin has done

that: Her complaint sought a transfer to MC311 and the
implementation of accessible software. (ECF No. 1, at 8). Her
trial victory caused the County to—in its own words—"transfer[]
her to [MC311]" and "make the software accessible for Plaintiff."
(ECF No. 300-2, at 43, 44). She may not have received every last
software upgrade and work assignment she wanted, but that means
only that she got "most" of her desired relief rather than all of
it. And "most" is enough. *Project Vote*, 444 Fed.App'x. at 664.

Looking past this logic, the County argues that attorneys'
fees are unwarranted because courts "usually" do not award
attorneys' fees to a plaintiff "who seeks compensatory damages,
but receives only nominal damages." (ECF No. 431, at 13). That
argument misunderstands how the Fourth Circuit measures the extent
of a plaintiff's relief. Courts measure relief not by counting
the money a plaintiff won at trial, but by "compar[ing] the relief
obtained by [a plaintiff] to the relief she sought." *Mercer*, 401
F.3d at 204.

Granted, when a plaintiff seeks "*only* compensatory damages"—
and "not injunctive or declaratory relief"—she achieves "limited
success" by obtaining a nominally favorable jury verdict
accompanied by next-to-nothing in damages. *Kane*, 675 Fed.App'x at
258 (emphasis added). That is why a plaintiff who receives mere
nominal damages often gets no attorneys' fees—because such a
plaintiff is usually seeking *only* monetary relief and nothing else.

But where, as here, a plaintiff seeks an *injunction*, she achieves a meaningful victory when she obtains a jury verdict that "entitle[s]" her to "equitable relief," *Reyazuddin III*, 988 F.3d at 798, and persuades the defendant to surrender most of the relief she sought in the first place, *see Project Vote*, 444 Fed.App'x. at 663-64.   That such a victory does not come with damages may somewhat reduce a plaintiff's success on this factor, but it hardly means she is so unsuccessful that she ought not receive any attorneys' fees at all.   *See also Hensley*, 461 U.S. at 435 n.11 ("[A] plaintiff who failed to recover damages but obtained injunctive relief . . . may recover a fee award.").[3]

Finally, the County argues that Ms. Reyazuddin should get no credit for her transfer because the transfer was "voluntary" and "extra-judicial." (ECF No. 431, at 14).   That is irrelevant.   Any surrender is technically voluntary because it involves a party *voluntarily* choosing to give up rather than continuing toward expected defeat.   Indeed, in *Project Vote*, the government likewise claimed that its decision to cease the challenged rule's enforcement "was entirely voluntary."   *Id.* at 662.   But the Fourth Circuit held that fees were nonetheless warranted in part because the plaintiff's success caused the government voluntarily to surrender "most of the equitable relief sought in the complaint."

---

[3] Degree of success is again considered in determining what is a reasonable award.

*Project Vote*, 444 Fed.App'x. at 663-64.  So too here: Voluntary or not, Ms. Reyazuddin's trial win caused the County to provide most of the relief she sought, and that is enough for the extent-of-relief factor to weigh in her favor.  *Id.* at 664.

### 2.  Significance of Legal Issue

The second factor courts consider is the "the significance of the legal issue on which the plaintiff prevailed." *Mercer*, 401 F.3d at 206 (internal quotation marks omitted).  A plaintiff satisfies this factor when her case establishes "novel . . . [or] important precedent." *Pitrolo*, 589 Fed.App'x at 630.  For example, this factor favors attorneys' fees when a plaintiff persuades a circuit court to "provide[] the framework" for a new category of statutory liability and then, operating within that framework, a jury makes a "first-of-its-kind liability determination." *Mercer*, 401 F.3d at 207.

Here, determining whether this factor weighs for or against attorneys' fees is difficult.  Ms. Reyazuddin established no novel or important precedent related to her underlying civil rights claims, but she did establish novel precedent about what it means to be a "prevailing party." *See Reyazuddin III*, 988 F.3d at 794.  Because it is unclear whether such precedent is relevant to the legal significance inquiry, it is unclear whether Ms. Reyazuddin's suit carries the legal significance required for this factor to weigh in her favor.

### a. Ms. Reyazuddin's underlying civil rights claims

To start, Ms. Reyazuddin established little novel or important precedent related to her underlying ADA and Rehabilitation Act claims. Rather, she obtained a jury verdict stating that the County took an adverse employment action against her and otherwise failed to provide her a reasonable accommodation. (ECF No. 221). But success on this factor "require[s] more" than "a jury verdict stating the defendant engaged in unlawful discrimination." *Pitrolo*, 589 Fed.App'x at 630. That is because such a verdict by itself "d[oes] not alter the landscape of civil rights law"—rather, it is "wholly determined by the legal landscape" that existed before the plaintiff sued. *Gray ex rel. Alexander v. Bostic*, 720 F.3d 887, 896 (11th Cir. 2013).

Resisting this conclusion, Ms. Reyazuddin argues that *Reyazuddin I*—the Fourth Circuit's opinion on her summary judgment appeal—established two novel rules. 789 F.3d at 407. She is unpersuasive on both scores.

First, she argues that *Reyazuddin I* "established that the failure to provide meaningful work can be [a] denial of a reasonable accommodation." (ECF No. 426-2, at 6). The Fourth Circuit did note that "a reasonable accommodation should provide a meaningful equal employment opportunity." *Reyazuddin I*, 789 F.3d at 416 (quoting H.R.Rep. No. 101-485, pt. 2, at 66 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 349)). But that principle—

which the court pulled verbatim from a 1990 House of Representatives report—is hardly novel. To the contrary: Courts in and out of this circuit have been applying the same rule for years. *See, e.g.*, *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F.Supp. 720, 737 (D.Md. 1996) ("[A] reasonable accommodation should provide a meaningful equal employment opportunity."); *Terrell v. USAir*, 132 F.3d 621, 627 (11th Cir. 1998) ("The intent of the ADA is that an employer needs only to provide meaningful equal employment opportunities.") (emphasis removed).[4]

---

[4] If Ms. Reyazuddin instead means to argue that *Reyazuddin I* established a new rule that an employer must provide an employee with work she finds personally meaningful or fulfilling, the Fourth Circuit held no such thing. Rather, it held that the County may not have reasonably accommodated Ms. Reyazuddin because it reassigned her from a full-time job to a part-time job. *Reyazuddin I*, 789 F.3d at 416. In reaching this conclusion, the court cited an email in which a county employee expressed concern that Ms. Reyazuddin's reassigned role may not provide her "with a full day of meaningful work." *Id.* That email, the court reasoned, was an "example" of evidence showing that her reassignment "did not amount to full-time employment," which "create[d] a genuine issue of material fact as to whether the accommodation provided by the County was reasonable." *Id.* That is hardly a novel or landscape-altering conclusion. Months before *Reyazuddin I*, another court in this circuit recognized that "reassignment to a permanent part-time position is not a reasonable accommodation . . . when an employee's primary position is full-time." *Nartey-Nolan v. Siemens Med. Solutions USA, Inc.*, 91 F.Supp.3d 770, 775 (E.D.N.C. 2015); *see also Hoffman v. Zurich Fin. Servs.*, No. 06 C 4980, 2007 WL 4219414, at *5 (N.D.Ill. Nov. 28, 2007) ("[R]eassignment to a permanent part-time position is not a reasonable accommodation.") (collecting cases).

Ms. Reyazuddin next argues that she established novel precedent by persuading the Fourth Circuit to hold that a government defendant's undue hardship must be measured against the defendant's "budget as a whole." (ECF No. 426, at 8). That again is not a novel proposition. True enough, the Fourth Circuit reasoned that "[t]he County's overall budget" is a "relevant factor[]" in analyzing the County's hardship. *Reyazuddin I*, 789 F.3d at 418. But that rule came straight from the Rehabilitation Act itself, which states that courts may evaluate a defendant's undue hardship by considering "the overall financial resources of the covered entity." 42 U.S.C. § 12111(10)(B)(iii). All told, this case established little novel precedent related to the underlying civil rights claims on which Ms. Reyazuddin prevailed at trial.

### b.   Ms. Reyazuddin's pursuit of attorneys' fees

Ms. Reyazuddin also argues that *Reyazuddin III*—the Fourth Circuit's opinion on her attorney fee appeal—established novel precedent about what it means to be a "prevailing party." (ECF No. 426-2, at 6). That argument has some merit—*Reyazuddin III* did indeed establish novel precedent.

There, the Fourth Circuit held—for the first time—that a plaintiff qualifies as a "prevailing party" under civil rights fee-shifting statutes when she achieves a merits victory in the district court and then persuades a defendant to "capitulate"

before an injunction can be granted.  *Reyazuddin III*, 988 F.3d at 798.  Before that holding, a plaintiff could only be a prevailing party if she had "obtained an enforceable judgment, consent decree, or settlement."  *S-1 and S-2 v. State Bd. of Ed. of N.C.*, 21 F.3d 49, 51 (4th Cir. 1994) (en banc).  And a plaintiff likewise could *not* be a prevailing party if her lawsuit merely "operate[d] as a catalyst for post-litigation changes in a defendant's conduct."  *Id.*  *Reyazuddin III* thus established novel precedent by creating a whole new class of prevailing plaintiff: One who lacks an enforceable judgment or settlement but still obtains a merits victory that persuades a defendant to forfeit the relief sought.  988 F.3d at 798.[5]

The County argues that *Reyazuddin III* is not so important because it purported to reach a "narrow" holding, *see* 988 F.3d at 798.  (ECF No. 431, at 18).  The holding is "narrow" in that it does not apply to a wide array of factual circumstances.  But that does not change the fact that *Reyazuddin III* "changed the law" by creating a new class of prevailing party.  *See Gray*, 720 F.3d at 896.

---

[5] Other circuit courts have advanced similar rules, *see, e.g.*, *Diffenderfer v. Gomez-Colon*, 587 F.3d 445, 454 (1st Cir. 2009) (collecting cases), but the legal significance factor is satisfied by first-of-its-kind *in-circuit* precedent.  *See Doe v. Kidd*, 656 Fed.App'x. 643, 653 (4th Cir. 2016) ("Doe's case was the first to so hold *in this Circuit*[.]") (emphasis added).

And however narrow that class may be, the Fourth Circuit has already applied *Reyazuddin III* to hold another plaintiff to be a prevailing party. *See Grabarczyk v. Stein*, 32 F.4th 301, 307 (4th Cir. 2022) ("*Reyazuddin* [*III*] governs this case."). There, the Fourth Circuit noted that, "[u]nder *Reyazuddin*, when a state ceases the activity challenged in a lawsuit after a court has ruled on the lawfulness of the activity and in response to that ruling, the plaintiff has prevailed." *Grabarczyk*, 32 F.4th at 307. Indeed, the court even distinguished prior in-circuit precedent that purported to require a prevailing party to have an enforceable judgment, *see S-1 and S-2*, 21 F.3d at 51, by noting that the prior precedent "had no occasion to address the different circumstances we later passed on in *Reyazuddin*." *Grabarczyk*, 32 F.4th at 309. *Reyazuddin III* appears to be something of a precedential milestone—a case that established a new rule and altered the landscape of an area of civil rights law.

It remains unclear, however, whether *Reyazuddin III* is relevant to the *Farrar-Mercer* analysis. The second *Mercer* factor is concerned with the significance of "the civil rights claim on which the plaintiff prevailed." *Pitrolo*, 589 Fed.App'x. at 630; *see also Kane*, 675 Fed.App'x. at 258 ("The second factor requires us to consider the 'general legal importance' of the issue *underlying* the plaintiff's victory.") (emphasis added). Thus, it seems that the relevant consideration is whether a plaintiff

established a novel legal principle related to her underlying "civil rights claim." *Pitrolo*, 589 Fed.App'x. at 630. Ms. Reyazuddin did not do that: She brought civil rights claims under the ADA and the Rehabilitation Act, and she established little novel precedent related to either of those claims. Rather, she established novel precedent related to her later pursuit of attorneys' fees, which would seemingly be irrelevant to the *Farrar-Mercer* analysis.

But none of the Fourth Circuit's prior case law applying the *Farrar-Mercer* factors has involved a plaintiff who established novel precedent on an attorney fee issue unrelated to her merits victory. The Fourth Circuit has not yet "had . . . occasion to address the different circumstances" present here. *Grabarczyk*, 32 F.4th at 309. Thus, it is unclear how much weight should be given to imprecise language in prior opinions that are not on-point. Luckily, the court need not resolve this conundrum because, as explained below, even if her case is legally insignificant, Ms. Reyzuddin has obtained sufficient relief to warrant attorneys' fees.

### 3. Public Purpose

Finally, courts ask "whether the litigation served a public purpose, as opposed to simply vindicating the plaintiff's individual rights." *Mercer*, 401 F.3d at 207. A plaintiff prevails on this factor when "the effect of . . . [her] case reaches well

beyond [the plaintiff] herself." *Id.* at 208.  For instance, the
public purpose factor favors attorneys' fees when a plaintiff's
case leads to a "change in [public] practice or policy," *Kane*, 675
Fed.App'x. at 260, or where her success "prevent[s] the enforcement
of an unconstitutional government regulation," *Project Vote*, 444
Fed.App'x. at 664.  By contrast, this factor weighs against
attorneys' fees where "the only goal [of the case is] . . . personal
to the [p]laintiff." *Pitrolo*, 589 Fed.App'x. at 630.

By any of these measures, Ms. Reyazuddin falls short.  Her
suit did not stop the enforcement of an unconstitutional rule or
change a public policy.  Nor did she obtain relief that affected
anyone beyond herself.  Rather, the relief she achieved was highly
individualized: She persuaded a government defendant to stop
discriminating against her (and her alone), and to provide
accommodations to her (and her alone).  In accommodating Ms.
Reyazuddin, the County built a special web application for her
exclusive use and performed extensive training "dedicated solely
to her."  (ECF No. 300-2, at 12); (ECF No. 300-14, at 2-5).
Attaining these concessions was no doubt a meaningful victory, but
it did little to benefit anyone beyond Ms. Reyazuddin herself.

Ms. Reyazuddin argues that her case "opened MC311 as an
available job option for blind individuals," (ECF No. 426, at 8),
but she does not specifically explain how it did so.  If she means
to argue that her suit persuaded the County to cease some kind of

19

widespread discriminatory hiring policy, then the record shows no
such policy existed.  Long before Ms. Reyazuddin's trial victory,
MC311 employed at least two other blind people.  (ECF No. 431, at
18); (ECF No. 433, at 7); (ECF No. 382, at 21, 135, 154-55).  And
while Ms. Reyazuddin argues—without citation—that these employees
do not actually work at MC311 "on a regular basis," (ECF No. 433,
at 7), the opposite appears to be true.  One is MC311's "call
center trainer"—he onboards the call center's new hires.  (ECF No.
382, at 24).  The other is the call center's "supervisor and
project manager"—he "manages . . . [MC311's] daily operations."
(ECF No. 382, at 155-56).  All told, the record disproves Ms.
Reyazuddin's apparent assertion that her lawsuit blazed a path at
MC311 for blind employees.

If she instead means to argue that her suit persuaded the
County to implement measures that benefit other blind employees,
that argument likewise fails.  The software and web applications
that the County implemented to accommodate Ms. Reyazuddin were
intended to remedy her specific needs and were designed for her
exclusive use.  (ECF No. 300-14, at 2-5).  She points to nothing
in the record to suggest that any other blind MC311 employee
benefits from—or even uses—the accommodations she received.
Indeed, Ms. Reyazuddin admits that other employees do *not* use the
same accessibility technology that she does.  (ECF No. 433, at 7)
(noting that "other blind County employees" do not "use[] a screen

reader like Ms. Reyazuddin"). Thus, whatever benefit her accommodations provide, that benefit falls on Ms. Reyazuddin and her alone.[6]

### 4. Weighing Factors

Even if Ms. Reyazuddin established no new precedent and benefited no one beyond herself, she obtained sufficient relief to warrant attorneys' fees. The Supreme Court has long held that the extent of a plaintiff's relief is the "most critical" factor in deciding her fee award. *Hensley*, 461 U.S. at 435. Thus, attorneys' fees are warranted when a plaintiff achieves "excellent results" or "substantial relief." *See id.* at 435, 440. What is more, when a plaintiff has obtained such relief, the Court has never conditioned that plaintiff's fee award on her ability to establish novel precedent or benefit others beyond herself. Rather, "substantial relief"—standing alone—warrants a "compensatory fee." *See id.* at 435, 440. When a plaintiff obtains

---

[6] The Fourth Circuit has also held that a lawsuit serves a public purpose where it establishes novel precedent. *See Mercer*, 401 F.3d at 209-10; *Kidd*, 656 Fed.App'x. at 653 (plaintiff's suit served a public purpose because it "was the first to establish" a novel kind of civil rights claim and "marked a milestone in the development of the law"). Thus, if the novel "prevailing party" precedent Ms. Reyazuddin established in *Reyazuddin III* counts towards the *Farrar-Mercer* analysis, then the public purpose factor would likewise favor attorneys' fees. That said, this court need not resolve this issue because Ms. Reyazuddin is entitled to attorneys' fees even if her case benefitted no one beyond herself.

substantial relief, that "result is what matters." *Fox v. Vice*, 563 U.S. 826, 834 (2011) (quoting *Hensley*, 461 U.S. at 435).

That approach makes good sense: Congress authorized fee-shifting in civil rights cases to improve judicial access for plaintiffs who have "meritorious civil rights claims" but cannot afford an attorney. *City of Riverside*, 477 U.S. at 576, 578. A plaintiff who prevails at trial and obtains her desired relief no doubt has a "meritorious" claim. Thus, even when her case is not one-of-a-kind, awarding her an attorney fee fulfills Congress's "statutory purposes." *See Fox*, 563 U.S. at 834. And while a small handful of meritorious civil rights claims are ground-breaking and publicly significant, most are not. Indeed, "[t]he vast majority of civil rights litigation does not result in ground-breaking conclusions of law." *Pino v. Locascio*, 101 F.3d 235, 239 (2d Cir. 1996). If a fee award *requires* breaking new ground, then the "vast majority" of plaintiffs whose claims are meritorious—but not ground-breaking—would be unable to recover fees and would thus lose the judicial "access" that Congress sought to guarantee. *City of Riverside*, 477 U.S. at 576, 578.

Here, attorneys' fees are warranted because Ms. Reyazuddin obtained "substantial relief." *See Hensley*, 461 U.S. at 440. Indeed, she got most of what she originally asked for. Her suit may have benefited few others and its legal significance is unclear, but, in the end, when a plaintiff obtains "meaningful

22

relief," "that result is what matters." *Fox*, 563 U.S. at 834 (internal quotation marks omitted).  Ms. Reyazuddin got the result she wanted—and that is enough.[7]

The Fourth Circuit has held that a case's legal significance and public purpose may "help" a court decide whether attorneys' fees are warranted. *See Mercer*, 401 F.3d at 204.  But it has never held that a plaintiff who obtained most of the relief she sought must also establish novel precedent or serve the public to get a fee award.  To the contrary—it has noted that "[t]he vast majority" of civil rights plaintiffs do not establish "ground-breaking conclusions of law." *See id.* at 210 (internal quotation marks omitted).  Thus, a plaintiff remains an "appropriate candidate[] for [a] fee award[]" as long as she obtains "meaningful relief." *Id.* (internal quotation marks omitted).  Just so here: Whether or not her case is "ground-breaking," Ms. Reyazuddin's "meaningful relief" warrants attorneys' fees. *Id.* (internal quotation marks omitted).

That conclusion finds support in the very opinion on which the *Mercer* factors are based: Justice O'Connor's concurrence in *Farrar v. Hobby*, 506 U.S. 103 (1992).  In *Farrar*, the Supreme

---

[7] *Cf. Burke v. Mattis*, 315 F.Supp.3d 907, 913 (E.D.Va. 2018) (attorneys' fees warranted even though the "case was not novel, did not establish important precedent, or otherwise advance the law" in part because the plaintiff obtained the injunctive relief she sought).

Court's majority held that a prevailing plaintiff was not entitled to attorneys' fees because he obtained mere "nominal" relief—that is, he "received nominal damages instead of the $17 million in compensatory damages that [he] sought." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). Writing separately, Justice O'Connor agreed with the majority's conclusion that the plaintiff obtained "[n]ominal relief" because he "asked for a bundle and got a pittance." *Id.* at 121. But she also reasoned that a plaintiff who obtains such limited relief may still be entitled to attorneys' fees if "other factors" make his victory "material" rather than merely "technical." *Id.* at 120. For instance, she reasoned, "his success might be considered material if [he] also accomplished some public goal" or if he "succeeded on a significant [legal] issue." *Id.* at 121-22.

Justice O'Connor examined the suit's public purpose and legal significance as alternate paths to a fee award for a plaintiff whose relief is limited—"other factors" that become relevant when a plaintiff obtains mere nominal relief. *Id.* at 121-22. By Justice O'Connor's logic, when a plaintiff "ask[s] for a bundle and g[ets] a pittance," she may still obtain attorneys' fees by otherwise furthering "some public goal." *Id.* at 121. But where—as here—a plaintiff asks for a bundle and gets *most of it*, she has already achieved a level of relief sufficient to warrant a fee

award, even with limited success on the "other factors."  *Id.* at
120-21.

## III. Reasonable Fee Analysis

Ultimately, Plaintiff seeks an award of $1,672,575.93 in fees
and $357,933.49 in costs and expenses, divided between Brown,
Goldstein & Levy, LLP ("BGL") and TRE Legal Practice ("TRE").  Ms.
Reyazuddin seeks attorneys' fees, costs, and expenses for three
"blocks" of time:

> (1) Pre-filing to the conclusion of the jury trial on February
> 26, 2016 ($1,191,836.60 in fees for 2556.8 hours billed);
>
> (2) End of jury trial to October 26, 2016, the date on which
> Ms. Reyazuddin moved to MC311 ($252,521.07 in fees for 567
> hours billed); and
>
> (3) Work done on her motion for attorneys' fees ($228,218.26
> in fees for 568.3 hours billed).

(ECF No. 426, 10-11, ECF No. 433 at 13).  She does not seek fees
for the time from her transfer to MC311 to the Fourth Circuit's
*Reyazuddin II* decision except for work on the fee petition.
Plaintiff asserts that she has already eliminated from her fee
request any billing entries for work that was "unneeded,
unsuccessful, or duplicative."  (ECF No. 426, at 16).  Both of
Plaintiff's law firms have also voluntarily reduced their fee
request as a matter of "billing discretion."  (ECF No. 426, at 9,
16).  They do so in different ways: BGL applied a 5% reduction to

its lodestar calculation, (ECF No. 426, at 4, 12), and TRE did not include 4.6% of its hours in its lodestar calculation to account for work that was "duplicati[ve]" and "inefficien[t]," (ECF No. 426-8, at 8).

The County objects to Plaintiff's calculation of fees, costs, and expenses, arguing that the hours requested are the result of overstaffing, the requested rates are unreasonable, and there should be an overall reduction to account for the minimal degree of success. It also contests some of the expenses sought.

Although Plaintiff has, in some ways, appropriately limited her request for attorneys' fees, she oversteps in other ways. As will be discussed, the hourly rates are too high, particularly when she seeks fees for multiple highly paid lawyers in overlapping roles. She also does not apply a sufficient reduction for limitations on success.

A reasonable fee is one that is "adequate to attract competent counsel, but that does not produce windfalls to attorneys." *Blum v. Stenson*, 465 U.S. 886, 897 (1984). To calculate a reasonable fee award, a court follows "a three-step process." *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013). First, it "determine[s] the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Id.* (internal quotation marks omitted). Second, it "subtract[s] fees for hours spent on unsuccessful claims unrelated to successful ones." *Id.* (internal

quotation marks omitted). Third, it awards "some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *Id.* (internal quotation marks omitted).

### A.   Lodestar Calculation

First, courts calculate the lodestar fee award by multiplying the reasonable hours a party's attorneys expended by a reasonable hourly rate. *McAfee*, 738 F.3d at 88. To decide reasonable hours and rates, courts consider the so-called *Johnson* factors, which are: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required properly to perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases. *Id.* at 88 n.5 (citing *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978)).

While the *Johnson* factors assist a court in calculating a reasonable fee award, a district court need not "consider all twelve *Johnson* factors." *Martin v. Mecklenburg County*, 151

27

Fed.App'x. 275, 283 (4th Cir. 2005); *see Hensley*, 461 U.S. at 434 n.9 ("The district court also *may* consider other factors identified in *Johnson*.") (emphasis added).[8]   And when consideration of a *Johnson* factor is implicitly "incorporated into the lodestar analysis," a court need not analyze it "a second time." *E. Assoc. Coal Corp. v. Dir., OWCP*, 724 F.3d 561, 570 (4th Cir. 2013).

Here, several *Johnson* factors are relevant to this case, and they are discussed in more detail below.   For instance, the lodestar calculation and the court's subsequent degree-of-success reduction turn in part on the court's consideration of Factor 1 (the time attorneys expended in this case), Factor 3 (the skill required to render the services performed), Factor 5 (customary fees for similar work), Factor 8 (results obtained), Factor 9 (counsel's experience), and Factor 12 (fee awards in other cases). Meanwhile, Factor 2—the "novelty of the legal theories" in the case, *see Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 180 (4th Cir. 1994)—carries unclear weight because, as discussed above, Ms. Reyazuddin's underlying claims did not involve novel legal issues, but her pursuit of attorneys' fees did.

---

[8] *See also In re A.H. Robins Co., Inc.*, 86 F.3d 364, 376 (4th Cir. 1996) ("[T]he district court is under no obligation to go through the inquiry of th[e] [*Johnson*] factors that do not fit."); *Baust v. City of Virginia Beach*, 574 F.Supp.3d 358, 364 (E.D.Va. 2021) ("A court need not consider all twelve *Johnson* factors, only those relevant to the particular litigation.").

Finally, there are several *Johnson* factors that carry little weight because they "do not fit" this case. *In re A.H. Robins Co., Inc.*, 86 F.3d at 376. Factor 4 is not relevant because Plaintiff asserts that her attorneys' "acceptance of this case" did not "preclu[de] . . . other employment." (ECF No. 426, at 23). Factor 7 likewise does not apply because Plaintiff asserts that "time limitations" were not "imposed by the client or the circumstances." (ECF No. 426, at 23). Factor 10 does not apply because Plaintiff asserts that this case was not "undesirable." (ECF No. 426, at 23). And Factor 11 is not relevant because "Plaintiff was not previously known to counsel." (ECF No. 426, at 23).

### 1.   Reasonable Rates

To determine reasonable hourly rates, a court "looks to the prevailing market rates in the relevant community." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010) (internal quotation marks omitted). While a court may rely on affidavits from local attorneys opining on the reasonableness of a plaintiff's requested rates, *see Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 244-45 (4th Cir. 2009), it may also "take judicial notice of its own knowledge of the local legal market," *see Carrera v. EMD Sales, Inc.*, No. 17-3066-JKB, 2021 WL 3856287, at *4 (D.Md. Aug. 27, 2021). And in the District of Maryland, "that 'market knowledge' is embedded in . . . Local Rules, Appendix B," which provide

guideline rates that vary based on an attorney's experience level. *Id.* (quoting *Chaten v. Marketsmart LLC*, No. 19-1165-PX, 2020 WL 4726631, at *3 (D.Md. Aug. 14, 2020)).

The Appendix B guideline rates are as follows: $150-225 for lawyers admitted to the bar less than five years; $165-300 for lawyers admitted for five to eight years; $225-350 for lawyers admitted for nine to fourteen years; $275-425 for lawyers admitted for fifteen to nineteen years; and $300-$475 for lawyers admitted for twenty years or more. The rate for paralegals and law clerks is $95-150.

Although these rates are not "binding," they are "presumptively reasonable." *Carrera*, 2021 WL 3856287, at *4 (internal quotation marks omitted). Thus, while a plaintiff may obtain an "upward departure[]" from the guideline rates, *see id.*, she bears "[t]he burden . . . to establish the reasonableness of a requested rate." *Robinson*, 560 F.3d at 244 (internal quotation marks omitted). To carry that burden, she must "produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award." *Id.* at 244-45.

Ms. Reyazuddin requests the following rates for her attorneys and paralegals, all of which are higher than the guideline rates in the District of Maryland:

- Daniel F. Goldstein (20+ years admitted to the bar throughout this litigation): $625

- Joseph B. Espo (20+ years admitted to the bar throughout this litigation): $595

- Timothy R. Elder (0-6 years admitted to the bar when he worked on this case; 12 years now): $525

- Rebecca Rodgers (1-2 years admitted to the bar when she worked on this case; 11 years now): $450

- Kevin Docherty (6-9 years admitted to the bar when he worked on this case; 10 years now): $475

- Mathias L. Niska (1-3 years admitted to the bar when he worked on this case; 10 years now): $450

- Albert Elia (1-2 years admitted to the bar when he worked on this case; 8 years now): $390

- Paralegal Barbara Thompkinson: $265

- Paralegal Angela Lima: $240

- Paralegal Kristopher Nelson: $265

Ms. Reyazuddin has met her burden to justify an hourly rate a bit higher than the current guideline rates for Mr. Goldstein and Mr. Espo.  Both are highly experienced and credentialed attorneys, and Ms. Reyazuddin has presented evidence that a local attorney with similar experience charges a rate above the

guidelines.  (ECF No. 426-20).  Their requested rates are, however, too high. Their time will be assessed at $550 per hour.

On the other hand, as will be explained, Ms. Reyazuddin requests rates that are too high for her other attorneys, and rates within the guidelines will be applied.  First, for Mr. Elder, she requests a rate of $525 per hour.  Mr. Elder no doubt has specialized experience litigating cases involving assistive technology for blind people.  (ECF No. 426-8, at 5) (explaining Mr. Elder's work as co-counsel on a case in which the Ninth Circuit held that blind examinees may take the Bar Exam using assistive technology, *see Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153 (9th Cir. 2011)).  But Ms. Reyazuddin has not justified why Mr. Elder—who had fewer than six years of legal experience throughout his work on this case—is entitled to a rate so far above the guidelines.  Indeed, as Plaintiff's own affidavits show, Omar Melehy—a local attorney with decades of experience—charges about $600 per hour, which is not much higher than the rate Mr. Elder requests.  (ECF No. 426-20, at 6).  She also requests more than $300,000 for an expert in the same field.  (ECF No. 426-24).  The court will reduce Mr. Elder's rate to $200 per hour for the first year that he worked on this case as an associate at BGL and $250 per hour for the remaining hours he billed to this case while working for TRE.

The rates for Ms. Reyazuddin's other attorneys will also be reduced to match the guidelines.  Mr. Niska, Ms. Rodgers, and Mr. Elia all had fewer than two years of legal experience when they worked on this case.  Mr. Docherty likewise had fewer than ten years of experience.  Yet, for each of these attorneys, Ms. Reyazuddin requests rates appropriate under the guidelines for attorneys with 15+ years of experience.

To justify these upward departures, she argues that these are "the same rates that Plaintiff's counsel has billed and been paid." (ECF No. 433, at 11).  But while an attorney's "customary rate[]" is "a *Johnson* factor to consider," it is "not dispositive," and the guideline rates "are more representative of a broader range of fees charged by practitioners appearing in federal court in Maryland."  *Carrera*, 2021 WL 3856287, at *6 (internal quotation marks omitted).  Thus, courts in this district have declined to depart from the guideline rates to match an attorney's customary fee.  *See, e.g.*, *id.*; *Burley v. Balt. Police Dep't*, No. 18-1743-SAG, 2020 WL 1984906, at *4 (D.Md. Apr. 27, 2020).

Ms. Reyazuddin next argues that the court should award fees based on her attorneys' current experience levels "to compensate for delay in payment." (ECF No. 433, at 10).  To be sure, "payment today for services rendered long in the past deprives the eventual recipient . . . of the use of the money in the meantime," which, "in an inflationary era, is valuable." *West v. Potter*, 717 F.3d

33

1030, 1034 (D.C. Cir. 2013) (internal quotation marks omitted). Thus, a court "must consider the effect of delay in payment . . . on the calculation of a reasonable fee." *Johannssen v. Dist. No. 1-Pac. Coast Dist., MEBA Pension Plan*, 292 F.3d 159, 180 (4th Cir. 2002), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). A district court "retains discretion to determine the particular method for accounting for the lost time-value of money due to delay in payment." *Id.* For instance, a court may calculate a fee award using "current hourly rates instead of historical ones," *see Reaching Hearts Intern., Inc. v. Prince George's County*, 478 Fed.App'x. 54, 60 (4th Cir. 2012), or instead "adjust[] the fee . . . to reflect [the] present value" of the services based on the experience that the attorney had when she performed the work, s*ee Perdue*, 559 U.S. at 556 (internal quotation marks omitted).

Here, Plaintiff asks not only for inflation-adjusted rates, but for her attorneys to be paid based on experience they did not have when they performed the work for which they are billing. Because this litigation has stretched nearly twelve years, that approach would result in a particularly unfair windfall for Plaintiff's counsel—it would allow certain lawyers to be paid as if they had more than a decade of experience, even though they actually had only a couple of years of experience when they did the work. That result would be inappropriate because a reasonable

hourly rate should generally reflect the experience an attorney had "when [he] actually performed the work." *Randolph v. PowerComm Constr., Inc.*, No. 13-1696-GJH, 2016 WL 6462167, at *4 (D.Md. Oct. 31, 2016), *vacated on other grounds*, *Randolph v. PowerComm Constr., Inc.*, 715 Fed.App'x. 227 (4th Cir. 2017).[9]

What is more, applying the guideline rates here actually helps neutralize any losses caused by the time value of money. Plaintiff's counsel began work on this case in 2010—four years before the guideline rates were last updated in 2014. Applying the guideline rates to work that Plaintiff's counsel performed *before* 2014 already accounts for some losses the delay may have

---

[9] *See also Flores v. Hoge*, No. 15-1988-DKC, 2016 WL 2924918, at *5 (D.Md. May 19, 2016) (deciding hourly rate by noting that "when performing the work on this case, the attorneys had been admitted to the bar for approximately six years"); *Thompson v. Barrett*, 599 F.Supp. 806, 814 (D.D.C. 1984) (noting that because a reasonable fee should "reflect[] the background, experience and expertise" an attorney had "at the time the services were performed," "[i]t would be a windfall indeed if services performed almost twelve years ago . . . could now be reimbursed" at a rate reflecting experience the attorney did not have when he worked the case).

Ms. Reyazuddin also points to several out-of-circuit cases in which a court calculated attorneys' fees using "an attorney's hourly rate at the time of the fee request, rather than the rate that applied at the time the work was performed, to compensate for delay in payment." (ECF No. 433, at 10). But reasonable rates are decided by looking to the "the relevant community," *see Perdue*, 559 U.S. at 551, and courts in the district of Maryland have in the past awarded attorneys' fees based on the experience an attorney had "when [he] actually performed the work, rather than applying the current rate to all hours of work performed in a case." *Randolph*, 2016 WL 6462167, at *4; *Flores*, 2016 WL 2924918, at *5.

caused.  And Plaintiff's counsel has not actually experienced a "delay in the payment of fees," *see Perdue*, 559 U.S. at 556, because her attorneys were "paid along the way" by a third-party funder—the National Federation of the Blind.  (ECF No. 433, at 10).  Thus, it is less important for Plaintiff's counsel to be "[c]ompensate[ed]" through a rate adjustment.  *Perdue*, 559 U.S. at 556.[10]

Nor can Ms. Reyazuddin justify an upward departure from the guideline rates simply by arguing that the guidelines are outdated.  (ECF No. 426, at 19).  While the guideline rates were last updated in 2014, that fact "is not automatically dispositive with respect to whether they reflect prevailing market rates in the community."  *Carrera*, 2021 WL 3856287, at *5.  Indeed, courts in the district of Maryland continue to apply the guidelines rates in cases where a plaintiff cannot justify an upward departure.  *See, e.g.*, *id.*; *Orellana v. Don Pollo of Bethesda, Inc.*, No. 20-2795-PWG, 2021 WL 2187014, at *4 (D.Md. May 28, 2021); *Castro v. Early Learning Language Acads., LLC*, No. 18-2421-CBD, 2021 WL 915106, at *6 (D.Md. Mar. 9, 2021).  And while plaintiff points to a recent case in which her attorneys' requested rates were approved, *see Boyd v. SFS Comms., LLC*, No. 15-3068-PJM (D.Md. Aug. 24, 2021), ECF No.

---

[10] The Fourth Circuit has not yet answered whether a fee award should account for delay of payment in a case where Plaintiff's counsel received "ongoing payments . . . during the litigation."  *See Reaching Hearts*, 478 Fed.App'x. at 61-62.

197, she likewise admits that fee petition was "unopposed." (ECF No. 433, at 12).[11]

To prove that Mr. Docherty, Mr. Elia, Ms. Rodgers, and Mr. Niska are entitled to the higher rates they seek, Ms. Reyazuddin must provide "specific evidence" that those rates match the market "for the type of work for which [s]he seeks an award." *See Robinson*, 560 F.3d at 244 (internal quotation marks omitted). Ms. Reyazuddin's evidence is not sufficiently specific. While she provides affidavits from local attorneys, those affidavits merely state that Plaintiff's requested rates as a whole are "generally comparable" to "market rates," (ECF No. 426-21, at 3), and "in line with" rates charged at another firm, (ECF No. 426-20, at 5). Beyond those generalized statements, Ms. Reyazuddin does not provide specific evidence that local attorneys with experience comparable to Mr. Docherty, Mr. Elia, Ms. Rodgers, and Mr. Niska charge the requested rates for comparable work. Thus, to match the guidelines, Mr. Docherty's rate will be reduced to $400, and the rates for Mr. Elia, Ms. Rodgers, and Mr. Niska will be reduced to $200.

---

[11] Ms. Reyazuddin also relies on a case in which the Maryland Bankruptcy Court awarded heightened attorney fees to the global law firm Littler Mendelson. *See In re: Creative Hairdressers, Inc.*, No. 20-14583 (D.Md.Bank. Nov. 25, 2020), ECF No. 778. Even if that case were comparable, that fee request was likewise unopposed and granted in a two-page unreasoned order. *See id.* at ECF No. 793.

Finally, Ms. Reyazuddin's requested rates for the paralegals that worked on her case are also too high.  Ms. Reyazuddin provides no specific evidence to explain why these paralegals ought to receive a rate more than one hundred dollars greater than the guideline rate for paralegals.  Thus, because Ms. Reyazuddin "do[es] not explain why the experience or services rendered by each of [her] paralegals . . . justify an hourly rate above the . . . relevant Appendix B rate," their time will be billed at $150 per hour.  *Carrera*, 2021 WL 3856287, at *6.

### 2.  Reasonable Hours

To determine reasonable hours expended, a court must "exclude from its . . . fee calculation" "hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. For example, a court may reduce Plaintiff's requested hours when Plaintiff's counsel "overstaffed" the case, *id.*, or when Plaintiff's hours are "duplicative." *Nelson v. A & H Motors, Inc.*, No. 12-2288-JKS, 2013 WL 388991, at *1 (D.Md. Jan. 30, 2013). Plaintiff has the burden to "show that the number of hours for which [s]he seeks reimbursement is reasonable." *Carrera*, 2021 WL 3856287, at *7 (quoting *Travis v. Prime Lending*, Civ. No. NKM-07-0065, 2008 WL 2397330, at *4 (W.D.Va. June 12, 2008)).

This court has adopted some guidelines for compensable time in Appendix B to the Local Rules which appear to have been followed in this fee request.  For example, only one lawyer is to be

compensated for attending depositions or hearings, or for intra-office conferences, unless specifically justified.

The County argues that Plaintiff's requested hours are unreasonable because it claims that her counsel overstaffed the case—both by having seven attorneys work the case throughout litigation and by having two highly experienced attorneys attend the trial. (ECF No. 431, at 23-24). The County also argues that Plaintiff's counsel billed too many hours for Block 1 (from pre-filing to the conclusion of trial) because the trial presented "common issues" such as "reasonable accommodation, adverse employment action, undue burden and non-economic damages." (ECF No. 431, at 24). Ms. Reyazuddin responds that, while seven attorneys worked her case, their work was "largely sequential, not concurrent" and that, at any given time, the case "was generally staffed with one partner and one associate." (ECF No. 433, at 8). She also argues that her counsel did not overstaff the trial because she "bore the burden of proof" and her "legal team was staffed with the resources she needed to win." (ECF No. 433, at 8-9).

After considering the parties' arguments and the *Johnson* factors, the court finds that the hours Plaintiff's counsel billed for the jury trial are excessive. Three attorneys attended trial, and all three took significant roles. But it was a luxury and not a necessity to have all of them there. Surely, either Mr. Espo or

Mr. Goldstein could have conducted the trial with some assistance. Indeed, at times, Mr. Goldstein completed tasks at trial that did not require his advanced experience.  He at one point held physical exhibits to show the court what was at issue.  At other points, he assisted in making sure Ms. Reyazuddin knew she could take a throat lozenge if needed and in inquiring if a spectator could use her own equipment to access the audio.  While helpful, these tasks could have been performed by a much less experienced person, particularly when Mr. Espo was also at trial.  To remedy this overstaffing, the court will remove from its lodestar calculation all hours Mr. Goldstein billed during Block 1 except for the 95 hours that he spent on the summary judgment appeal in *Reyazuddin I*.  (ECF No. 433-2, at 3, 19-20).

The County's other arguments for hour reductions in Block 1 are unavailing.  While seven total attorneys did indeed work Plaintiff's case throughout the course of the 11-year-long litigation, Plaintiff's counsel usually had one partner and one associate working the case at any given time, with minimal overlap.  (ECF No. 433, at 8).  Nor is the County right to argue that Plaintiff's counsel spent too long preparing for trial because the trial involved "common issues."  The trial was not simple—it involved live demonstrations of screen reader technology and complex expert testimony.  The County fails to identify any specific instances in which it believed that a particular attorney

40

spent too long on a particular trial-preparation task, and the court does not find unreasonable the overall hours Plaintiff's counsel billed while preparing for trial, particularly when Mr. Goldstein's hours have been removed.[12]

The County also objects to all hours and expenses for Block 2, the time from the jury verdict until Plaintiff's transfer to MC311. (ECF No. 431-1, at 6). It argues that all of the discovery and motions practice had to relate to Plaintiff's requested injunctive relief, as to which she was unsuccessful. Plaintiff counters that she is entitled to compensation for this work because she did achieve the injunctive relief she sought—transfer to MC311— and that work during this time helped her to obtain that relief. (ECF No. 433, at 6). While not entirely free from doubt, the court will not reduce the lodestar by entirely eliminating these hours. It may have been that preparing for the hearing on injunctive relief, with its attendant discovery and motions practice, is what ultimately persuaded the County to make the transfer and to prepare the necessary software upgrades. The Fourth Circuit described the transfer as the County's capitulation. The timing may, on the

---

[12] Indeed, throughout the entirety of this more-than-decade-long litigation, the County identifies only one specific instance in which it believed that a particular attorney spent too long on a particular task: It argues that Mr. Elder spent too long reading cross-motions for summary judgment (6.1 hours). (ECF No. 431, at 24). But as Plaintiff notes, she has not counted that billing entry toward her requested fee award. (ECF No. 433, at 8).

other hand, have been merely fortuitous and unaffected by the litigation that was ongoing.  It is also likely that some of the discovery from this period was used in the later, unsuccessful, attempt to persuade the court that her position at MC311 was not adequate.  But that fact does not convert otherwise compensable time to work on an unsuccessful claim.  The doubt about this time will, however, be considered in the degree of success reduction.

All told, after applying the reduced hourly rates and reducing Plaintiff's requested hours, the lodestar is $1,117,700.00.

**B.   Subtracting Fees for Unsuccessful Claims**

After calculating the lodestar, a court "subtract[s] fees for hours spent on unsuccessful claims unrelated to successful ones." *Robinson*, 560 F.3d at 244 (internal quotation marks omitted). Here, Ms. Reyazuddin has already omitted the hours her counsel spent unsuccessfully pursuing some of her claims and injunctive and declaratory relief after the County transferred her to MC311. (ECF No. 26, at 10-11).  In contrast, other time "devoted generally to the litigation as a whole", *Hensley*, 461 U.S. at 435, is indivisible.  In such a case, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id*.

Ms. Reyazuddin requests fees only for hours spent on matters on which she succeeded (at least in part), including the jury

trial, the successful appeal in *Reyazuddin I*, and her successful pursuit of attorney fees.   Thus, no further subtractions for unrelated, unsuccessful claims are warranted.  *See Carrera*, 2021 WL 3856287, at *4 (declining to make "further reductions . . . under the second prong" because "counsel for Plaintiffs has already omitted hours spent in pursuit of unsuccessful motions").   Overall degree of success will be assessed next.

   **C.   Degree-of-Success Adjustment**

   Finally, a court may reduce a plaintiff's fee award, "depending on the [plaintiff's] degree of success." *McAfee*, 738 F.3d at 88 (internal quotation marks omitted).  A plaintiff's fee award should "properly reflect her success in th[e] case." *Id.* at 94.   And if a plaintiff achieves "only part of the success she sought, the lodestar amount may be excessive." *Id.* at 93. Indeed, even when—as here—a plaintiff has achieved "significant" relief, the court may reduce the fee award if the plaintiff's success "is limited in comparison to the scope of the litigation as a whole." *Id.* at 92.   For instance, a court may reduce a fee award when a plaintiff pursues—and fails to obtain—damages at trial.   *Id.* at 93.   The County argues that a 90% reduction is appropriate, reducing the award to less than $100,000. (ECF No. 431, at 38).

   Here, in obtaining a transfer to MC311, Ms. Reyazuddin obtained "substantial relief." *Hensley*, 461 U.S. at 440.  But her success was also limited in other ways, which warrants a reduction

43

to her fee. *Id.* at 439-40 ("A reduced fee award is appropriate if the relief, *however significant*, is limited in comparison to the scope of the litigation as a whole.") (emphasis added). While she ultimately was transferred to MC311, as noted at the outset, she may have gotten there without litigation and it is far from conceded that the litigation, particularly in Block 2, played any role.  The County always recognized its obligation to provide a reasonable accommodation in the form of alternate work until it would be able economically to transfer her to an accessible MC311. The bulk of the litigation surrounded the County's attempts to do so and the County's assertion of undue hardship.  Plaintiff also sought $129,000 in damages at trial—yet the jury gave her $0.  That failure is relevant to *Johnson* Factor 12 (fee awards in similar cases) because—as the County points out—"Plaintiff fails to identify any cases in which [a plaintiff] was awarded zero dollars, zero injunctive relief and zero declaratory relief, but still achieved [over $1 million] dollars in attorney's fees." (ECF No. 431, at 37-38).  And no court decided whether the final alternate position she was offered before trial was a reasonable accommodation.

All told, this case, vigorously litigated by both sides, has taken more than a decade to get to this point, with a jury trial, a bench trial, and three appeals to the Fourth Circuit. Understandably, the fee request is large.  But, even with the

reductions in the lodestar fashioned above, an attorneys' fee over $1 million is simply too high. Thus, the court will apply an overall reduction of 30%, which includes the reductions suggested by Plaintiff's counsel.

## IV.  Costs and Expenses

Ms. Reyazuddin requests reimbursement for costs and expenses in the amount of $357,933.49.  This includes $302,400.00 for "Expert Fees." (ECF No. 426-2, at 13).  The County takes issue specifically with Ms. Reyazuddin's request for expert fees because, according to its reading of the statute, expert fees are not recoverable under the Rehabilitation Act.  (ECF No. 431 at 36).  Ms. Reyazuddin acknowledges that there is a split of authority among district courts, and that no circuit court—let alone the Fourth Circuit—has addressed whether a prevailing plaintiff is entitled to recover expert witness fees in a case brought under The Rehabilitation Act. (ECF No. 429).

Despite the absence of clear guidance, Ms. Rayazuddin argues that the 2009 Amendments to the Rehabilitation Act clarified that any remedies available under 42 U.S.C. § 2000e-5(e)(3), including "expert fees as part of the attorney's fee," are available under the Rehabilitation Act. (ECF No. 433).

The Rehabilitation Act provides:

> The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection

> (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

29 U.S.C. § 794a(a)(2).   The portion in parentheses—"(and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation)"—was added in 2009.  *See* Pub. L. No. 111-2, 123 Stat. 5.

Title VI of the Civil Rights Act of 1964 ("Title VI"), which begins at 42 U.S.C. § 2000d, contains no provision that allows prevailing plaintiffs to recover expert fees as a remedy.  The Civil Rights Attorney's Fees Award Act of 1976 allows for recovery of attorney's fees in actions proceeding under Title VI, among other civil rights laws not relevant here, but it only allows for recovery of expert fees in actions brought pursuant to 42 U.S.C. §§ 1981, 1981a (not pertinent to Ms. Reyazuddin's case).  42 U.S.C. § 1988(b).  Title VII of the Civil Rights Act of 1964 ("Title VII") begins at 42 U.S.C. § 2000e.  Title VII contains a provision that allows prevailing plaintiffs to recover expert fees as well as attorney's fees at § 2000e-5(k).

The question is essentially whether, in adding the parenthetical to 29 U.S.C. § 794a(a)(2), Congress intended to extend the remedies available under Title VII only to "claims of discrimination in compensation" or more broadly to "any person

aggrieved" under the Rehabilitation Act.  As the parties note, this is an unsettled question of law about which no circuit court has expressed an opinion.

The plain text of the provision conditions the expanded remedies to those complaining of "discrimination in compensation." Because Ms. Reyazuddin has not claimed such discrimination, the remedies in Title VII are not available to her—she may only take advantage of the remedies available under Title VI.  This reading is supported by language in the Lilly Ledbetter Fair Pay Act, the law that amended the Rehabilitation Act in 2009.

The Lilly Ledbetter Fair Pay Act of 2009 amended Title VII and the Age Discrimination in Employment Act "to clarify that a discriminatory compensation decision or other practice that is unlawful under such Acts occurs each time compensation is paid pursuant to the discriminatory compensation decision or other practice."  Pub. L. No. 111-2, 123 Stat. 5.  It also "modif[ied] the operation of the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973" to reflect that clarification. *Id.*  To that end, the legislation states that the amendments made to Title VII at 42 U.S.C. § 2000e-5(e) "shall apply to claims of discrimination in compensation brought under sections 501 and 504 of the Rehabilitation Act of 1973." *Id.*  This context emphasizes Congress's intention that the language added to the Rehabilitation Act incorporating the Title VII remedies "set forth . . . in

subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5)"
only be "applied to claims of discrimination in compensation"
brought under the Rehabilitation Act.  This is also supported by
the legislative history.  *See* 155 Cong. Rec. H547 (daily ed. Jan.
27, 2009) (statement of Rep. George Miller) ("Finally, S. 181
ensures that these simple reforms extend to the Age Discrimination
in Employment Act, the Americans with Disabilities Act and the
Rehabilitation Act to provide these same protections for victims
of age and disability discrimination.").

   Having brought no claims involving discrimination in
compensation, Ms. Reyazuddin can only avail herself of the remedies
set forth in Title VI.[13]   Therefore, she is not entitled to

---

[13] There does not appear to be a decision by any other court
interpreting the 2009 amendments in this way.  Indeed, many other
district courts have interpreted the 2009 amendments as extending
the remedies available under Title VII to all prevailing
Rehabilitation Act plaintiffs.  *See, e.g.*, *Lawton v. Success Acad.
Of Fort Greene*, No. 15-cv-07058-FB-SMG, 2021 WL 911981, at *1-2
(E.D.N.Y. March 10, 2021) (stating that "[n]umerous courts have
made clear that the 2009 Amendment to [the Rehabilitation Act]
allows for the reimbursement of expert fees" and authorizing the
recovery of expert fees in a case not involving discrimination in
compensation); *Jones v. George Fox Univ.*, No. 3:19-cv-0005-JR,
2022 WL 4120783, at *4 (D.Or. Sept. 9, 2022) (noting that
"amendments to the Act indicate that remedies, procedures, and
rights set forth in Title VI of the Civil Rights Act of 1964 (42
U.S.C. 2000d et seq.) shall be available to any person aggrieved
under section 794" but citing a section in Title VII for the
proposition that "the court, in its discretion, may allow the
prevailing party reasonable attorney's fee (including expert fees)
as part of the costs" for a Rehabilitation Act case not involving
pay discrimination); *I.H. ex rel D.S. v. Cumberland Valley Sch.
Dist.*, 842 F.Supp.2d 762, 777 (M.D.Pa. 2012) ("We believe that
[the Rehabilitation Act] thus contemplates an award of expert fees

compensation for expert fees.  In so concluding, this court is mindful of the Supreme Court's holding in *W. Va. Univ. Hosps., Inc. v. Casey* that it "transcends the judicial function" for courts to shift expert fees when not explicitly authorized to do so by statute. 499 U.S. 83, 101 (1991) (quoting *Iselin v. United States*, 270 U.S. 245, 250-251 (1926)).

Even if Ms. Reyazuddin were eligible to recover expert fees, she has not made the requisite showing of reasonableness for her request for $302,400 in expert fees.  It is Ms. Reyazuddin's burden to establish the reasonableness of her expert fees.  *See Royal Maccabees Life Ins. Co. v. Malachinski*, No. 96-C-6135, 2001 WL 290308, at *16 (N.D.Ill. Mar. 20, 2001).  She points out that her expert was instrumental to her success in the case and that the County subsequently adopted many of the expert's recommendations. (ECF No. 426, at 19).  But Ms. Reyazuddin provides no evidence supporting the exorbitant amount of expert fees beyond a list of dates and payments that add up to $302,400.00.  (ECF No. 426-3, at 250-51).  It is unclear, for example, how many hours the expert spent working on the case, what work she performed on certain dates, or what rate she charged.  "When the reasonableness of an expert's fees is not fully explained, the Court may exercise its

---

to the prevailing party in its assumption of the rights and remedies of the Civil Rights Act."). However, analysis by the courts that have addressed this question has been underdeveloped and sometimes contradictory.

discretion to determine a reasonable fee." *Penberg v. HealthBridge Mgmt.*, No. 08-CV-1534(CLP), 2011 WL 1100103, at *15 (E.D.N.Y. Mar. 22, 2011) (collecting cases). Courts have "denied requested expert fees in their entirety where the documentation proffered in support of the award was 'plainly deficient,' in that it failed to itemize the expert's hourly rate, number of hours spent, and a description of the work performed." *Ariza v. Luxottica Retail N. Am.*, No. 17-CV-5216(PKC)(RLM), 2022 WL 970779, at *3 (E.D.N.Y. Mar. 31, 2022). In any event, Ms. Reyazuddin's request for expert fees will be denied.

The County does not dispute the other $55,533.49 in costs and expenses Ms. Reyazuddin requests, other than for the reasons previously discussed—her "minimal degree of success."

The Fourth Circuit has recognized a "presumption that costs are to be awarded to the prevailing party," which a district court can only overcome "by articulating some good reason for doing so." *Cherry v. Champion Int'l Corp.*, 186 F.3d 442, 446 (4th Cir. 1999) (internal quotation marks omitted). Only those costs delineated in 28 U.S.C. § 1920 may be recovered as costs. *Wyne v. Medo Indus., Inc.*, 329 F.Supp.2d 584, 586 (D.Md. 2004). The following costs for which Ms. Reyazuddin seeks reimbursement are allowed under § 1920: Hearing/Trial Transcripts, Court Costs, Private Process, Copying, Deposition Transcripts, Deposition Videographers, and Witness Fees. All other expenses are not

taxable as costs under § 1920 but are recoverable as part of attorney's fees: those related to travel, research, technology used in preparation for trial, teleconference, postage, and delivery services.[14]

Parties seeking costs must generally support their request with an affidavit that each cost "is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed." 28 U.S.C. § 1924. Ms. Reyazuddin's attorneys have submitted affidavits that describe the costs and expenses she requests (though not in great detail), state that they were "necessary for the results obtained," and attach spreadsheets listing each cost and the date it was incurred. (ECF Nos. 426-2 through 426-5, 426-8, 10). The affidavit from BGL acknowledges that receipts were not included but offers to provide them if required. Because the County does not challenge the specific costs and expenses requested, other than expert fees, Ms. Reyazuddin's request for costs and expenses in the amount of $55,533.49 will be granted.

## V.   Conclusion

Ms. Reyazuddin's motion for attorneys' fees, expenses, and costs, will be granted in part and denied in part. The court will

---

[14] *See Thomas v. Treasury Mgmt. Ass'n*, 158 F.R.D. 364, 372 (D.Md. 1994) (noting that costs for legal research, local transportation, postage, and courier services are part of attorneys' fees).

award $782,390 in attorneys' fees and $55,533.49 in costs and expenses.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge